## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC.<br>500 Water Street<br>Jacksonville, FL 32202 | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ANTHONY A. WILLIAMS,<br>in his official capacity as Mayor<br>of the District of Columbia<br>1350 Pennsylvania Avenue, N.W.<br>Suite 600<br>Washington, D.C. 20004 | ) ) ) ) ) ) | Civil Action No. _____ |
| DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004 | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff CSX Transportation, Inc. ("Plaintiff" or "CSXT") complains and alleges as follows:

### INTRODUCTION

1.     This suit seeks to have this Court declare invalid and to enjoin the implementation and enforcement of a recently enacted District of Columbia ordinance that has the purpose and effect of precluding the interstate shipment by rail through the District of Columbia of materials that are essential to the health, welfare and economy of this nation.  This ordinance is protectionist legislation that, on its face, unreasonably burdens interstate commerce, interferes with the comprehensive federal regulation of the shipment of hazardous materials by rail and invites other local jurisdictions to enact

copycat legislation which could, by crazy-quilt coverage, bring to a halt the interstate shipment of critically important materials throughout the United States of America.

2.      On February 1, 2005, the Council of the District of Columbia ("D.C. Council") passed the Terrorism Prevention in Hazardous Materials Transportation Emergency Act of 2005, Bill 16-77 (the "District Act" or the "Act"). A copy of the District Act is attached hereto as Exhibit 1.

3.      The stated purpose of the District Act is "[t]o prohibit, on an emergency basis, large shipments of certain extremely hazardous materials through or near the United States Capitol in order to reduce the risk of attacks by terrorists, to allow for the issuance of permits authorizing such shipment in special cases, and to require the Mayor to issue regulations to implement the provisions of this Act."

4.      Mayor Anthony A. Williams signed the District Act into law on February 15, 2005.

5.      The District Act prohibits interstate rail shipments of four specified classes of hazardous materials (the "Banned Materials") through the District of Columbia without a permit issued by the District of Columbia Department of Transportation ("DDOT"). The Act prohibits shipments within the so-called "Capitol Exclusion Zone," defined as the area "within 2.2 miles of the U.S. Capitol Building." District Act, § 3(2). That radius reaches both of CSXT's rail lines carrying freight through the District of Columbia.

6.      As a common carrier, CSXT has a statutory duty to transport goods and materials upon reasonable request by a shipper. 49 U.S.C. § 11101.

7.    CSXT transported over 7,000,000 carloads of freight in 2003, including 500,000 carloads of hazardous materials.  CSXT carries a wide variety of goods and materials, including coal, steel, grain and food products, automobiles, petroleum products, chemicals, phosphates and fertilizers, clay and stone, lumber and wood, pulp and paper, and machinery and equipment.

8.    The Secretary of Transportation, with the concurrence of the Secretary of Homeland Security, has comprehensively regulated the transportation of hazardous materials by rail with respect to both safety and security.

9.    The Federal Government has determined that hazardous materials, including the Banned Materials, may be transported in interstate commerce as long as they are transported in accordance with federal regulations.

10.    Hazardous materials, including the Banned Materials, are used in a wide variety of goods and services that are essential to the health, welfare and economy of the United States.  The economy depends on interstate commerce in hazardous materials.

11.    A significant volume of hazardous materials is transported by rail among manufacturers, distributors, and end users.  According to statistics maintained by the U.S. Department of Transportation ("DOT"), transportation of hazardous materials by rail has been safer than transportation by truck.

12.    Plaintiff seeks a judicial declaration that the District Act (1) violates the Commerce Clause of the United States Constitution (Article I, § 8, cl. 3); (2) is preempted by the express preemptive provisions of the Federal Railroad Safety Act, 49 U.S.C. § 20106, the federal Hazardous Materials Transportation Act, 49 U.S.C. § 5125(a) and (b), and the Interstate Commerce Commission Termination Act, 49 U.S.C.

§ 10501(b); and (3) was passed as an *ultra vires* act by the D.C. Council under the Home Rule Act.

13.     Plaintiff also seeks a temporary restraining order, and preliminary and permanent injunction against the implementation and enforcement of the District Act.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Article I, § 8 of the United States Constitution; Article VI of the United States Constitution; the Federal Railroad Safety Act, 49 U.S.C. §§ 20101-20153 ("FRSA"); the federal Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101-5127 ("HMTA"), and the Interstate Commerce Commission Termination Act, 49 U.S.C. §§ 10101-11908 ("ICCTA").  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

15.     Pursuant to 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over Plaintiff's claim that the District Act was not an authorized exercise of legislative power under the Home Rule Act.

16.     The Court may issue a declaratory judgment and further relief in this matter pursuant to 28 U.S.C. §§ 2201-2202.

17.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

18.     Plaintiff CSX Transportation, Inc. ("CSXT") is a Virginia corporation with headquarters in Jacksonville, Florida.

19.     CSXT is a Class I freight railroad that owns and operates over a rail network east of the Mississippi River of more than 21,000 route miles in 23 states, the District of Columbia and two Canadian provinces (from Illinois in the northwest to Massachusetts in the northeast to Florida in the southeast to Louisiana in the southwest).

20.     CSXT is a railroad subject to the jurisdiction of the Secretary of

Transportation as defined in FRSA, 49 U.S.C. § 20103, a person who transports

hazardous materials as defined in HMTA, 49 U.S.C. § 5103, and a rail carrier subject to

the jurisdiction of the Surface Transportation Board as defined in ICCTA, 49 U.S.C.

§ 10501.

21.     A CSXT north-south main line (the "I-95 line") runs along the eastern

seaboard from Florida to New York and New England and passes through the Capitol

Exclusion Zone.

22.     A CSXT east-west main line (the "B&O" line) connecting the Mid-

Atlantic region (southeastern Pennsylvania, Delaware, Maryland, and northern Virginia)

with points west as far as the Mississippi River also passes through the Capitol Exclusion

Zone.

23.     CSXT has for decades regularly transported hazardous materials,

including the four classes of hazardous materials newly prohibited by the District Act, on

its north-south and east-west main lines through the District of Columbia.

24.     The District of Columbia is a municipal corporation, established by

Congress as authorized in the United States Constitution, Art. 1, § 8, cl. 17, by Act of

Feb. 21, 1871, ch. 62, 16 Stat. 419, § 1.

25.     Defendant Mayor Williams executed the District Act.  The District Act

(§ 7) charges the Mayor with responsibility for issuing rules to implement and enforce the

Act.  As the chief executive of the District of Columbia, Mayor Williams also oversees

DDOT, which the Act (§ 5) authorizes to process applications for permits for

transportation of the Banned Materials.

26.     As a municipal corporation, Defendant District of Columbia is a proper defendant in a civil action against agencies and departments of the District of Columbia.

## FACTUAL ALLEGATIONS

### CSXT Rail Operations

27.     CSXT is the successor to some of the oldest railroads in the United States, including the Baltimore & Ohio Railroad, the Chesapeake & Ohio Railway, and the Richmond Fredericksburg & Potomac Railway, all founded in the nineteenth century.

28.     Railroads were built as private enterprises to link major industrial production and consuming markets. As such, they were typically built between and through cities, and the cities themselves often expanded around, and because of, the rail lines. Unlike the publicly funded highway network, railroads do not typically have outer belts or bypass routes around cities. Most efforts to design alternative routes to avoid a particular city would merely shift the routing to a different city or group of cities.

29.     CSXT, like all major rail carriers, operates pursuant to an operating plan. CSXT seeks to design and maintain an operating plan that efficiently utilizes resources – including track and yard facilities, locomotives, cars and crews – consistent with all applicable federal safety and security requirements.

30.     In 2003, CSXT transported approximately 500,000 carloads of hazardous materials subject to federal hazardous materials regulations. Cars carrying hazardous materials are included in merchandise trains with other cars carrying non-hazardous materials. About forty to fifty percent of all CSXT trains include some cars carrying hazardous materials.

31.     CSXT regularly transports hazardous materials (including the Banned Materials), as required by shipper needs, over all of its main lines, including on its north-south and east-west main lines through the District of Columbia.

32.     Hazardous materials are transported in specially designed and constructed cars in accordance with DOT and industry specifications.  These cars are typically owned (or leased) by the shippers or their consignees, not the railroads.  After the car carrying hazardous material has arrived at its destination and the material has been off-loaded to the shipper's customer, the substantially empty "residue" car is returned to the shipper by the most efficient route for re-loading.  Both the loaded cars and unloaded "residue" cars are marked with various indicators, including DOT-prescribed placards.

### Federal Regulation of Rail Transportation and Hazardous Materials

33.     The Federal Government comprehensively regulates rail safety and security.

34.     The Secretary of Transportation, through the Federal Railroad Administration ("FRA"), administers FRSA and other federal railroad safety laws (49 U.S.C. chapters 201-213 and chapter 51), which encompass "every area of railroad safety," 49 U.S.C. § 20103.  The FRA has issued and enforces the federal railroad safety regulations, 49 C.F.R. Parts 200-268.  These regulations address track and roadbed conditions; signal systems; locomotive and freight car specifications; emergency preparedness; hours of service of railroad employees; operating practices and procedures; qualification standards for certain employees; and alcohol and drug testing of railroad employees, among other things (amounting to over 700 pages in the Code of Federal Regulations).

35.     Pursuant to 49 U.S.C. § 20104, the FRA has authority to issue temporary orders prohibiting operations on a line in response to emergency situations. Neither the FRA nor any other federal agency has prohibited CSXT from transporting any hazardous materials through the District of Columbia.

36.     The Secretary of Transportation, through the Research and Special Programs Administration ("RSPA"), also issues regulations "for the safe transportation, including security, of hazardous material in intrastate, interstate and foreign commerce," including by rail. 49 U.S.C. § 5103(b). Pursuant to HMTA, RSPA has designated certain materials as "hazardous" and has issued regulations for the safe and secure transportation of these materials. The regulations that apply to rail (49 C.F.R. Parts 171-174, 178-180) address packaging, identification, handling and security requirements, among other things. These regulations (amounting to over 900 pages in the Code of Federal Regulations) are enforced by the FRA.

37.     The Secretary of Transportation has recognized the importance of hazardous materials to the economy of the United States. For example, DOT recently stated:

> Hazardous materials are essential to the economy of the United States and the well being of its people. Hazardous materials fuel cars and trucks, and heat and cool homes and offices. Hazardous materials are used for farming and medical applications and in manufacturing, mining, and other industrial processes.

Notice, "Hazardous Materials: Transportation of Explosives by Rail," 68 Fed. Reg. 34,470, 34,472 (June 9, 2003).

38.     Following September 11, 2001, the Federal Government further enhanced its regulation of rail security and the transportation of hazardous materials by enacting the

Aviation and Transportation Security Act (Pub. L. No. 107-71, 115 Stat. 597) on

November 19, 2001, which created the Transportation Security Administration ("TSA").

TSA was transferred from the DOT to the Department of Homeland Security ("DHS") as

of March 1, 2003 by operation of the Homeland Security Act of 2002 (Pub. L. No. 107-

296, 116 Stat. 2135).  The Secretary of Homeland Security, through the TSA, has the

authority to make determinations regarding the adequacy of security in all modes of

transportation, including rail, and to set standards for additional rail security (after

consultation with the Secretary of Transportation in accordance with 49 U.S.C.

§ 5103(b)(1)(C)).

39.     Following September 11, 2001, the rail industry, with the participation of

CSXT, promptly developed an industry security plan to upgrade the security of the

national rail network.  Each Class I railroad (including CSXT) then developed its own

specific security plan.

40.     RSPA published Final Rule HM-232 on March 25, 2003, requiring

persons who offer for transportation or transport certain highly hazardous materials to

develop and implement security plans.  Hazardous Materials: Security Requirements for

Offerors and Transporters of Hazardous Materials, 68 Fed. Reg. 14,510 (codified at 49

C.F.R. §§ 172.800-804).  Representatives of TSA and FRA have reviewed the CSXT

security plan.  CSXT is in full compliance with the requirements of this regulation.

41.     TSA evaluated the Secretary of Transportation's rail safety and security

regulations, including HM-232, and concluded that further security regulation is not

presently required for the rail industry:

> TSA evaluated the measures currently required under DOT
> hazmat and rail regulations, the nature of rail operations,

> and the security enhancements completed by railroads, and
> has determined that, for the present, they adequately
> address the security concerns of which it is aware.

Notice, Hazardous Materials: Transportation of Explosives by Rail, 68 Fed. Reg. 34,470,

34,474 (June 9, 2003).

42.    DOT and TSA continue to evaluate the need for further federal regulation

to enhance rail transportation security.  They agree that any further regulation must be

based on a "comprehensive, risk-based approach" that is "narrowly tailored to suit the

industry and the threat."  Notice, Hazardous Materials: Transportation of Explosives by

Rail, 68 Fed. Reg. 34,470, 34,474 (June 9, 2003).  For example, DOT and TSA have

given notice that they are examining the need for enhanced security requirements for the

rail transportation of certain hazardous materials, and have solicited comments.  Notice,

Hazardous Materials: Enhancing Rail Transportation Security for Toxic Inhalation

Hazard Materials, 69 Fed. Reg. 50,998 (Aug. 16, 2004).

43.    DOT, DHS/TSA, and other federal agencies continue to evaluate the need

for other federal action.

44.    During 2004, and with the full cooperation of CSXT, TSA undertook the

D.C. Rail Corridor Project, a comprehensive vulnerability assessment of CSXT's north-

south main line through the District of Columbia.  This assessment was conducted by

federal agency security experts over a period of several months, using state-of-the-art

assessment techniques and standards.  Representatives of FRA and DHS also participated

in this effort.  TSA and CSXT are in the process of implementing the enhanced security

measures recommended by TSA.

45.    CSXT regularly consults with the Federal Government regarding

intelligence information relevant to threats to its rail network.  CSXT cooperates with

federal representatives to address ongoing safety and security concerns and promptly responds to orders of the Federal Government.

46.    As part of CSXT's security planning, and in coordination with federal authorities, CSXT has from time to time temporarily held or detoured over other CSXT routes cars carrying hazardous materials.

47.    CSXT also consults and cooperates with state and local officials regarding rail safety and security matters.

## Terrorism Prevention in Hazardous Materials
## Transportation Emergency Act of 2005 (the District Act)

48.    Unsatisfied with the Secretary of Transportation's comprehensive regulations, and despite TSA's specific attention to the D.C. Rail Corridor, the D.C. Council determined to take matters into its own hands and banned the transportation of four classes of hazardous materials through the District of Columbia.  In passing the District Act, the D.C. Council expressly and incorrectly found that "[t]he Federal Government has not acted to prevent the terrorist threat resulting from the transportation of dangerous quantities of ultra-hazardous materials near the Capitol."  District Act, § 2(3).

49.    The D.C. Council passed the District Act as emergency legislation on February 1, 2005.  Under District of Columbia law, emergency acts are passed on only one reading by the D.C. Council, are not reviewed by Congress, and are effective for 90 days.  Home Rule Act §§ 412(a) (D.C. Code § 1-204.12), 602(c)(1) (D.C. Code § 1-206.02).

50.    In sponsoring the District Act, Councilmembers Kathy Patterson and Phil Mendelson urged their colleagues to approve the legislation, stating that "[t]he legislation

will effectively prevent the through shipment of [the Banned Materials] by rail or truck, thereby removing the risk and threat to our residents."

51.    The District Act (§ 4(1)) prohibits the transport, without a DDOT permit, within the so-called "Capitol Exclusion Zone" of specified quantities of the Banned Materials.  The District Act (§ 4(2)) also prohibits the transport, without a DDOT permit, within the Capitol Exclusion Zone, of a residue rail car that is "capable" of containing the Banned Materials and has exterior placarding or other markings indicating such materials.  In effect, the District Act prohibits all rail shipments of the Banned Materials (including both loaded and residue cars) through the District of Columbia since the tracks on which CSXT transports freight pass through the Capitol Exclusion Zone.

52.    The prohibition can be lifted in "cases of emergency."  District Act § 4. The District Act confers the exclusive authority upon DDOT to determine whether there is an "unanticipated, temporary situation that threatens the immediate safety of individuals or property," so as to warrant lifting the ban.  District Act § 3(2).

53.    Upon information and belief, DDOT can be expected to determine that such an emergency situation exists only rarely, if ever.

54.    The District Act provides for issuance of a permit "authorizing the transportation of [Banned Materials] upon a demonstration that there is no practical alternative route."  District Act § 5(a).  "Practical alternative route" is defined to mean any route "(1) [w]hich lies entirely outside the Capitol Exclusion Zone; and (2) [w]hose use would not make shipment of the materials in question cost-prohibitive."  District Act § 3(4).

55.    This definition does not allow DDOT to take into account the extent to which alternative routes would simply shift the inherent risk of hazardous materials transportation to other jurisdictions.  Nor does it allow DDOT to consider the extent to which alternative routes would increase the risk of transporting a shipment of hazardous materials due to such factors as increased distance, increased transit time, increased car handlings, longer yard "dwell" time, and/or topographical or engineering characteristics of other routes.

56.    The D.C. Council stated that the purpose of the Act was to allow for the issuance of permits only "in special cases," and it expressly found that "[s]hippers of ultra-hazardous materials do not need to route large quantities of ultra-hazardous chemicals near the Capitol in order to ship these chemicals to their destinations . . . ." District Act, § 2(4).

57.    Even if CSXT could obtain a permit for certain shipments of the Banned Materials, the District Act is still invalid protectionist legislation, and the delay inherent in the requirement to obtain a permit, and any additional measures imposed as conditions of the permit, would impose an unreasonable burden on CSXT, shippers and interstate commerce given the comprehensive federal regulation of the transportation of hazardous materials by rail with respect to both safety and security.  FRSA, HMTA and ICCTA preempt the District Act without regard to the possibility that DDOT might issue permits for certain shipments.

## The Effect of the District Act

58.    The District Act effectively precludes CSXT's use of its sole north-south main line along the eastern seaboard and of its important east-west main line serving the

- 13 -

Mid-Atlantic region for the transport of the Banned Materials (both loaded and residue cars) that may be lawfully transported under federal law.

59.    With respect to its north-south line, the closest alternative available to CSXT is a line that runs west of the Appalachian Mountains through Tennessee, Kentucky and Ohio. The closest alternative east-west route to the north is a line that runs from Albany, New York to Buffalo, New York and thence along Lake Erie through Cleveland, Ohio. The closest alternative east-west route to the south is a line that runs from Richmond, Virginia to Charleston, West Virginia and points west.

60.    These alternative routes add hundreds of miles and days of transit time to the trip. The alternative routings also increase the number of times a car must be handled and the dwell time in yards. Longer transit distances and times, and increased car handlings and dwell time, are factors that tend to increase the inherent risk of transporting hazardous materials.

61.    Unless CSXT is given adequate time to prepare for enforcement of the District Act, complying with the Act would have an immediate and seriously detrimental impact on the operation of the entire CSXT network. CSXT would have to identify trains with any cars of the Banned Materials en route to the District, stop the trains in a rail yard (most likely in Philadelphia, PA, Baltimore, MD, Cumberland, MD and Richmond, VA), and remove the cars from each train. This is a time consuming and disruptive operation.

62.    With yards already operating at capacity, these additional switching operations can be expected to create congestion in the yards, back up traffic on the main lines, and disrupt the entire network. This congestion would also adversely affect the Amtrak and commuter services (MARC and VRE) operating over CSXT lines.

63.    Once a car carrying a Banned Material is removed from a train, it would have to be held in the yard until a suitable route/train is found.  Cars would likely have to be batched in the yards for several days to a week while arrangements are made for rerouting them.

64.    CSXT estimates that if it had approximately ten days before enforcement of the District Act, it could issue instructions so that trains carrying cars of the Banned Commodities could be stopped in yards closer to the point of origin, preventing some of the predicted short-term congestion in the yards surrounding Washington, D.C.  CSXT estimates that it would take approximately a month to make the changes to the computer routing programs required to reroute cars of the Banned Materials from the point of origin to the least disruptive alternative route for each shipment.  However, this planning, issuance of instructions, and entry of changes in the routing programs is, in and of itself, very burdensome to CSXT.

65.    In the Spring of 2004, in consultation with federal officials, CSXT instituted a voluntary reroute of loaded cars carrying certain hazardous materials that would have traversed its north-south line through the District.  But the District Act is much broader in scope:  it extends to the east-west line and includes residue cars on both lines, and therefore mandates rerouting of many more cars than were being rerouted voluntarily.

66.    Even in the longer term, after CSXT would have had the opportunity to plan for rerouting, the District Act would have serious impacts on the CSXT network. The more circuitous moves and the additional handlings would significantly reduce the capacity and flexibility of the CSXT network.

67.     The District Act would require CSXT to reroute an estimated total of 11,400 cars per year. Based on 2004 traffic data, CSXT estimates that the mandated reroutes would require an additional 2,000,000 car miles per year and an additional 7,400 handlings per year over the efficient operating plan.

68.     The District Act would preclude CSXT from utilizing its rail network, equipment and personnel in the most efficient manner, decreasing its capacity and flexibility not just for transport of the Banned Materials, but for all freight.

69.     Preclusion of CSXT's use of its north-south and east-west main lines through the District for the Banned Materials would thus result in slower service and decreased predictability of service, not only for shippers of the Banned Materials and their customers, but for shippers of other freight. Shippers and customers would suffer costs and other burdens as a result of the District Act.

70.     In addition, these alternative routes merely reroute hazardous materials through other jurisdictions, including other urban areas. The District Act would not mitigate the risk inherent in the transportation of hazardous materials, but would simply shift the burden to other jurisdictions.

71.     Moreover, if the District Act is not invalidated, other local jurisdictions will likely follow the District of Columbia's lead and pass their own local laws banning the transport of hazardous materials through their communities, effectively eliminating all rail routing options for hazardous materials within the scope of those laws.

72.     In fact, the principal sponsor of the District Act, Councilmember Kathy Patterson, has affirmatively urged other communities to follow suit. John Gallagher, *Rail's Pandora's Box*, Traffic World, Nov. 1, 2004, at 11.

73.     On information and belief, representatives of other local jurisdictions have expressed an interest in enacting legislation similar to the District Act if the Act is not invalidated.

74.     CSXT has no adequate remedy at law for the burdens imposed on it by the District Act.  If the relief requested herein is not granted, CSXT will suffer immediate irreparable harm.

75.     Nor will any remedy at law address the havoc the District Act (and other copycat local laws) will wreak on interstate commerce.

**COUNT I**
**(Declaratory/Injunctive Relief – Violation of the Commerce Clause**
**of Art. I, § 8, cl. 3 of the United States Constitution)**

76.     Plaintiff realleges and incorporates herein by reference the allegations of all foregoing paragraphs.

77.     The promotion and protection of interstate commerce is a central function of the Federal Government.

78.     The law has long recognized that the free flow of goods and materials throughout the nation is essential to the national economy.

79.     The Commerce Clause of the United States Constitution (Art. I, § 8) provides the Federal Government with the power to promote and regulate commerce, and prohibits state or local protectionist legislation like the District Act.

80.     A jurisdiction may not increase hazards on rail lines located in neighboring states in order to decrease the hazards within its own jurisdiction.

81.    The District of Columbia enacted the District Act with the express purpose and necessary effect of shifting the risks inherent in the transport of certain hazardous materials to other jurisdictions.

82.    Any decision about rerouting hazardous materials on the national rail network must be made by the Federal Government.  Only the Federal Government may determine, taking into account competing interests within the nation as a whole, whether conditions within the District of Columbia, or other local area, warrant the prohibition of the otherwise lawful transport of any hazardous materials by rail through that local area.

83.    The District Act therefore, on its face, violates the Commerce Clause of the United States Constitution, and imposes an unreasonable burden on interstate commerce.

## COUNT II
### (Declaratory/Injunctive Relief – Preemption by Federal Railroad Safety Act)

84.    Plaintiff re-alleges and incorporates herein by reference the allegations of all foregoing paragraphs.

85.    The District Act is preempted on its face under the express preemption provision of the Federal Railroad Safety Act, 49 U.S.C. § 20106, and the Supremacy Clause of Article VI of the United States Constitution.  Congress enacted FRSA to provide for national uniformity of regulation relating to rail safety and security "to the extent practicable."  49 U.S.C. § 20106.

86.    The preemptive umbrella of FRSA applies to any rail safety or security action taken by the Secretary of Transportation or the Secretary of Homeland Security,

including rail safety and security regulations issued under HMTA (49 C.F.R. Parts 171-174, 178-180).

87.     The Secretary of Transportation has comprehensively regulated the safety and security of the transportation of hazardous materials by rail, and the Secretary of Homeland Security has concurred with DOT's security regulations.

88.     FRSA's express preemption provision, 49 U.S.C. § 20106, provides that *states* may regulate a subject matter "relating to railroad safety or security" until the Secretary of Transportation or Secretary of Homeland Security has issued regulations covering the subject matter.  Once either Secretary has regulated the subject matter, states are preempted from imposing more stringent or additional requirements on the same subject matter unless three criteria are met:

> (1)     The state law is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (2)     The state law is not incompatible with a law, regulation or order of the United States Government; and
>
> (3)     The state law does not unreasonably burden interstate commerce.

89.     Unlike states, municipal corporations are preempted from regulating any subject matter "relating to railroad safety or security," regardless of whether the Secretary of Transportation or Secretary of Homeland Security has regulated the same "subject matter."

90.     The District of Columbia is a municipal corporation, not a state within the meaning of FRSA.  FRSA thus expressly preempts all District of Columbia acts relating to rail safety and security.  The District Act relates to rail safety and security and is thus preempted.

91.    Even if the District of Columbia were considered a state within the meaning of FRSA, the District Act is nonetheless preempted under FRSA because the Secretary of Transportation has issued comprehensive regulations relating to the subject matter of the safe and secure transportation of hazardous materials by rail (including the Banned Materials), and the District Act does not satisfy any of the three criteria for state regulation under FRSA, let alone all three.

92.    The District Act is not necessary to eliminate or reduce an essentially local safety or security hazard.  The District of Columbia is not the only jurisdiction facing the threat of terrorism after September 11, 2001.  It is not the only city designated as a "High Threat Target City."  Any threat related to the presence of the United States Capitol within the District of Columbia is not an "essentially local safety hazard," but a quintessentially "federal" concern to be evaluated and addressed by the Federal Government.

93.    The District Act is not compatible with federal laws, regulations and orders, including federal laws that define railroads' common carrier obligations, that authorize the shipment of hazardous materials when federal requirements are complied with, and that require shipments of hazardous materials to expedited (49 C.F.R. § 174.14).

94.    As explained above, the District Act would impose an unreasonable burden on interstate commerce.

95.    The District Act is accordingly preempted under FRSA and is void.

## COUNT III
### (Declaratory/Injunctive Relief – Preemption by Hazardous Materials Transportation Act)

96.    Plaintiff re-alleges and incorporates herein by reference the allegations of all foregoing paragraphs.

97.    The District Act is preempted on its face under the express preemption provision of the Hazardous Materials Transportation Act, 49 U.S.C. § 5125(a) and (b), and the Supremacy Clause of Article VI of the United States Constitution.

98.    The Secretary of Transportation, through RSPA, has extensively regulated the safe transportation, including security, of hazardous materials by rail, as expressly authorized by 49 U.S.C. § 5103(b), and the Secretary of Homeland Security has concurred with DOT's security regulations.

99.    The District Act is preempted under 49 U.S.C. §5125(b) because its requirements are not substantively the same as the RSPA requirements.  The District Act prohibits the transportation of the Banned Materials when federal law plainly allows for their transport, and requires a shipping document (a D.C. permit) not required by RSPA.

100.   In addition, even if 49 U.S.C. § 5125(b) does not preempt the District Act, the Act is preempted under 49 U.S.C. § 5125(a), which preempts a state or local requirement if

(1)    it is not possible to comply both with the state or local requirement and a federal requirement; or

(2)    the state or local requirement "is an obstacle to carrying out" the HMTA or an implementing regulation.

101.   The District Act poses an obstacle to compliance with numerous federal regulations, including federal laws allowing for the transport of hazardous materials,

subject to their requirements, and the regulation requiring shipments of hazardous materials to be expedited, and thus is preempted by HMTA.

**COUNT IV**

**(Declaratory/Injunctive Relief – Preemption by Interstate Commerce Commission Termination Act)**

102.    Plaintiff re-alleges and incorporates herein by reference the allegations of all foregoing paragraphs.

103.    It is the policy of the United States Government to promote a sound national rail transportation system "to meet the needs of the public and the national defense." 49 U.S.C. § 10101.

104.    Pursuant to ICCTA, the Surface Transportation Board ("STB") has exclusive jurisdiction to regulate the "transportation" of a "rail carrier" over a railroad, as those terms are defined in 49 U.S.C. § 10102, including the routes for freight shipments. The ICCTA authorizes CSXT to transport freight, including the Banned Materials, on its north-south and east-west lines through the District.

105.    The District Act is preempted on its face under the express preemption provision of ICCTA, 49 U.S.C. § 10501(b), and the Supremacy Clause of Article VI of the United States Constitution.  Section 10501(b) provides that the jurisdiction of the STB over "transportation by rail carriers, and the remedies provided in this part with respect to . . . routes" is exclusive, and further provides that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

106.    Under the terms of the District Act, the District of Columbia is exercising jurisdiction to regulate the transportation of a rail carrier (CSXT) by prohibiting CSXT

- 22 -

from transporting the Banned Materials that ICCTA authorizes CSXT to transport

through the District, unless CSXT secures a permit.

107.   CSXT filed with the STB on February 7, 2005 a Petition for Declaratory

Order, asking the Board to declare that the District Act is preempted by ICCTA § 10501.

The District is being afforded an opportunity to be heard.  CSXT requested expedited

handling, but does not know when the STB will act on the Petition.

108.   Pursuant to 49 U.S.C. § 11123, the STB has authority to issue temporary

orders directing routing of rail traffic in emergency situations.  The STB has not ordered

CSXT to route hazardous materials away from the District of Columbia.

### COUNT V
### (Declaratory/Injunctive Relief – Act Not Authorized by Home Rule Act)

109.   Plaintiff re-alleges and incorporates herein by reference the allegations of

all foregoing paragraphs.

110.   Congress is authorized "[t]o exercise exclusive Legislation in all Cases

whatsoever, over . . . the Seat of the Government of the United States."  United States

Constitution, Article I, § 8, cl. 17.

111.   Pursuant to the District of Columbia Self-Government and Governmental

Reorganization Act ("Home Rule Act"), Pub. L. No. 93-198, 87 Stat. 774 (1973) (as

amended), Congress delegated to the D.C. Council the power to "legislat[e] upon

essentially local District matters."  Home Rule Act § 102 (D.C. Code § 1-201.02).

112.   Congress has ceded to the government of the District of Columbia limited

powers of self-governance.  Congress did not grant the D.C. Council the power to

legislate with respect to functions of the United States, or to enact legislation which

applies to conduct beyond the boundaries of the District.  Home Rule Act § 602(a)(3)

(D.C. Code § 1-206.02).  The D.C. Council's direct regulation of interstate commerce, which will affect routing of freight in numerous states, exceeds the powers Congress granted to it.

113.   Because the D.C. Council and Mayor Williams lack the power to enact the District Act under the Home Rule Act, the District Act is invalid as an *ultra vires* act.

114.   The District Act is also invalid because it was passed as an emergency act when there is no true emergency in light of comprehensive federal regulations and the ongoing attention of the Federal Government to rail safety, including security, in the District of Columbia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CSXT prays:

A.   For a declaration that (1) the Terrorism Prevention in Hazardous Materials Transportation Emergency Act is invalid; and (2) it is contrary to law for Defendant Mayor Williams and/or Defendant District of Columbia to enforce the District Act against Plaintiff;

B.   For a temporary restraining order, and a preliminary and permanent injunction requiring Defendants Mayor Williams and District of Columbia to conform their conduct to such judicial declaration and barring them from implementing or enforcing in any way the District Act;

C.   For such costs and reasonable attorneys' fees to which it might be entitled by law;

D.   For such other, further or different relief as this Court may deem just and appropriate.

Respectfully submitted,

*Mary Gabrielle Sprague*

Dated: February 16, 2005

Irvin B. Nathan (D.C. Bar No. 090449)
Mary Gabrielle Sprague (D.C. Bar No. 431763)
Kathryn E. Taylor (D.C. Bar No. 486564)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
(202) 942-5999 (fax)

Ellen M. Fitzsimmons
Peter J. Shudtz
Paul R. Hitchcock
CSX TRANSPORTATION, INC.
500 Water Street
Jacksonville, FL  32202
(904) 359-3100

*Attorneys for Plaintiff CSX Transportation, Inc.*