**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CSX TRANSPORTATION, INC.                )
                                        )
                Plaintiff,              )
        v.                              )Civ. Action No. 05-338 (EGS)
                                        )
                                        )
ANTHONY A. WILLIAMS, et al.             )
                                        )
                Defendants              )
_____)

**MEMORANDUM OPINION & ORDER**

Plaintiff CSX Transportation Inc. ("CSXT"), a freight railroad and the exclusive rail carrier of hazardous materials through the District of Columbia, seeks to enjoin enforcement of defendant District of Columbia's Terrorism Prevention in Hazardous Materials Transportation Emergency Act ("Terrorism Prevention Act" or the "Act"). The law, which is scheduled to take effect on April 20, 2005, would prohibit rail transport of certain ultrahazardous materials within a 2.2 mile zone around the United States Capitol. Plaintiff contends that the District's legislation violates the Commerce Clause of the United States Constitution, is preempted by federal law, and violates the limited authority granted to the District of Columbia government by Congress pursuant to the Home Rule Act.

Pending before the Court are plaintiff's Motion for Summary

1

Judgment or in the alternative Motion for a Preliminary
Injunction, as well as the United States' Motion to Enforce a
related decision by the Surface Transportation Board.  Upon
consideration of the motions; the responses and replies thereto;
the numerous additional pleadings submitted by plaintiff CSXT,
defendant District of Columbia, the United States, intervenor-
defendant Sierra Club, and the *amicus curiae*; oral argument held
in open court on March 23, 2005; an *ex parte, in camera*
presentation held on April 4, 2005; and the entire record herein,
the Court concludes for the following reasons that plaintiffs'
motions must be **DENIED.**

## I.   INTRODUCTION

This case involves longstanding principles of federalism
applied to one of the government's newest and most important
roles--protecting our Nation from the threat of terrorism.  At
issue is a simple, but potentially devastating, scenario: the
deliberate targeting and destruction of a railroad car containing
chlorine gas or other ultrahazardous material in the heart of
Washington, D.C.  Like the airline highjackings of September 11,
2001, this kind of attack would exploit a familiar component of
the country's infrastructure and turn it against us.  The results
could be catastrophic.  One study estimates that an attack on a
single rail tank car of chlorine traveling through Washington,

during a celebration or political event, could kill or seriously harm 100,000 people within an hour.[1]  The toxic plume resulting from such an attack could extend over 40 miles from the point of release, including a core area of about 4 miles by 14.5 miles within which exposure could be deadly.[2]

The Court is not called upon to choose the best policy to protect the country from this potential nightmare--that is a matter for our elected representatives.  Rather, this litigation requires an interpretation of how Congress and the Constitution have distributed authority to prescribe solutions among and between the different levels of government.  Each level of government has a role to play.  Congress is responsible for developing the statutory framework to address this threat; the Executive branch is responsible for implementing and carrying out the national policy; and state and local governments are responsible for exercising their traditional police powers to protect their citizens, but only up to the limits of the Constitution.

The Court recognizes that the federal government has the *ultimate* authority and responsibility to provide a safe, secure,

---

[1]Sierra P.I. Opp. Ex. 9, Report by Dr. Jay Boris, United States Naval Research Institute (Jan. 23, 2004)(excerpt).

[2]Sierra P.I. Opp. Ex. 7, Chlorine Institute, Pamphlet 74 (April 1998)(excerpt).

and efficient rail transportation system in the United States and to formulate an effective and coordinated response to the threat of terrorism.  *See* 49 U.S.C. § 20103 (authorizing the Secretary of Transportation to regulate rail safety and security); 49 U.S.C. § 5103 (authorizing the Secretary of Transportation to regulate security of hazardous materials in transit); *see also Jifry v. F.A.A.*, 370 F.3d 1174, 1183 (D.C. Cir. 2004) ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation.")(quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)).  Clearly, the federal government is best positioned to develop and implement measures that will protect not only the District of Columbia, but the entire Nation, and to balance the benefits of those safeguards with their corresponding costs and burdens on interstate commerce.

Congress, however, has enacted a statutory framework that specifically provides authority for states, acting in partnership with the federal government, to regulate in the areas of railroad safety and hazardous material transportation ***if*** the federal government has not yet acted to comprehensively cover a new risk. *See* 49 U.S.C. § 20106; 49 U.S.C. § 5125.  Thus, this case is not about whether or not the D.C. Council has *unconditional* authority to choose whether or not hazardous materials may enter the District; it clearly does not.  Rather, this case presents the

4

much narrower and fact-specific question of whether the District

of Columbia, pursuant to its traditional police powers and on a

temporary basis, may prohibit the rail carriage of certain

hazardous materials through the District *until* the federal

government has more thoroughly addressed the threat of terrorist

attack on trains and has put sufficient safeguards in place.

## II.  BACKGROUND

### A.    The Federal Statutory Framework

The transportation of hazardous materials ("hazmats") in

interstate commerce is essential to the economy of the United

States and the well-being of its people.  Hazmats, including

propane gas and chlorine, fuel our vehicles, heat and cool our

homes and offices, and clean our drinking water.  At the same

time, the inherent physical, chemical, and nuclear properties of

hazmats can present serious risks to public safety, especially

while in transit.  For example, a January 2005 freight train

derailment in South Carolina caused a chlorine gas leak that left

nine people dead, more than 200 injured, and caused about 5,400

residents to be evacuated from their homes.[3]  For this reason,

the federal government, under the Department of Transportation

---

[3] *See A Toxic Case in Court*, Editorial, The Washington Post,
April 5, 2005, at A22 ("If there is any question about the
legitimacy of the city's worries, look no farther than January's
freight train derailment in South Carolina ...").

("DOT"), closely regulates the safe and secure transportation of hazmats in all modes of transportation. *See* the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101-5127 ("HMTA").[4]

The federal government also has a central role in regulating the interstate railroads. The Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 10101-11908 ("ICCTA"), replaced the former Interstate Commerce Commission with the Surface Transportation Board ("STB" or the "Board"), and vested the Board with broad jurisdiction over transportation by rail carriers and the national rail network. *See* 49 U.S.C. § 10501. The Federal Railroad Safety Act, 49 U.S.C. §§ 20101-20153 ("FRSA"), provides an additional layer of federal authority over rail safety and security.[5]

---

[4] Under the DOT's Hazardous Materials Regulations ("HMR"), 49 CFR parts 171-180, hazmats are divided into nine general classes according to their physical, chemical, and nuclear properties. These regulations are promulgated by DOT's Research and Special Programs Administration ("RSPA"). DOT estimates that 1.5 billion tons of these regulated hazmats are transported each year. The majority of hazmats move by truck (56%), while rail shipments account for only six percent of the tonnage. *See* 68 Fed. Reg. 34470, 33472 (June 9, 2003).

[5] The DOT's Federal Railroad Administration ("FRA") enforces Rail Safety Regulations ("RSR") covering "all areas of rail safety" including track speed, track and roadbed conditions, track safety standards, signal systems, brake system standards, hours of service requirements for railroad employees, operating practices, drug and alcohol testing, and other rail carrier operations. *See* 49 C.F.R. Parts 200-268. The FRA also enforces Hazardous Materials Regulations related to rail transportation. *See* 49 C.F.R. Parts 171-174, 178-180.

Historically, the federal government has focused its rail safety and hazmat regulatory programs on the types of "operational" risks that are inherent in rail transportation. These risks include, for example, hazmat releases caused by the accidental collision or derailment of rail cars.  However, the terrorist attacks of September 11, 2001 shocked the world and prompted a wide-ranging reassessment of the risks facing our country.  With those attacks came the realization that some of the most serious threats to our safety may no longer be considered "accidents."  As a result, Congress moved quickly to reorganize the government and provide regulatory agencies and law enforcement with new tools to address these new threats.

As part of this effort, Congress amended the core statutes addressing railroad safety and hazmat transportation, and provided DOT with additional authority to regulate railroad security along with its traditional focus on conventional risks. *See* Homeland Security Act of 2002, Pub. L. 107-296, Title XVII, §§ 1710-1711 (Nov. 25, 2002).  DOT began advising industry of voluntary measures to enhance hazmat security,[6] and issued regulations requiring shippers and carriers to develop company-specific "security plans" for the transportation of

---

[6] *See* Advisory Notice: Enhancing the Security of Hazardous Materials in Transportation, 67 Fed. Reg. 6963 (Feb. 14, 2002).

certain hazardous materials.  *See* Hazardous Materials: Security
Requirements for Offerors and Transporters of Hazardous
Materials, 68 Fed. Reg. 14510 (March 25, 2003)(codified at 49
C.F.R. §§ 172.800-804)("HM-232").  The Transportation Security
Administration ("TSA"), under the auspices of the Department of
Homeland Security ("DHS"), also began working with rail carriers
to minimize security risks and continues to assess, develop, and
implement enhanced security measures on the rail network,
including measures specific to the D.C. Rail Corridor.[7]  *See*,
*e.g.*, Hazardous Materials: Enhancing Rail Transportation Security
for Toxic Inhalation Hazard Materials, 69 Fed. Reg. 50988 (Aug.
16, 2004); *see also* P.I. Mem. Ex. 8, Written Testimony of Thomas
Lockwood, Public Roundtable on the Progress of the District of
Columbia Rail Corridor Security Initiative (Nov. 22, 2004).

These federal agencies are facing an enormous challenge, but
they have made significant strides, especially in the areas of
aviation and maritime security.  However, it is widely

---

[7] The Homeland Security Act of 2002, Pub. L. No. 107-296, 116
Stat. 2135, directed DHS to assume responsibility for "securing
the ... air, land, and sea transportation systems of the United
States."  6 U.S.C. § 202(2).  Acting through the TSA, the
Assistant Secretary of Homeland Security is empowered, among
other things, to "assess threats to transportation;" "develop
policies, strategies, and plans for dealing with threats to
transportation security;" "ensure the adequacy of security
measures for the transportation of cargo;" and "issue, rescind
and revise such regulations ... as are necessary to carry out TSA
functions."  49 U.S.C. § 114(f); 6 U.S.C. § 203(2).

acknowledged that much work remains to be done.  Dr. Richard A. Falkenrath, the former Deputy Homeland Security Advisor and Deputy Assistant to the President, warned Congress in January 2005 that "since 9/11 we have essentially done nothing" to reduce the inherent vulnerability of our chemical sector.  *See* Sierra Opp. Ex. 24, Testimony of Richard A. Falkenrath, before the United States Senate Committee on Homeland Security and Governmental Affairs (Jan. 26, 2005).  Dr. Falkenrath advised Congress that toxic-by-inhalation chemicals, such as chlorine gas,

> are basically World War I era chemical weapons, which we move through our cities in extraordinary large quantities and quite low security.  I'm sorry to say, since 9/11 we have essentially done nothing in this area and made no material reduction in the inherent security of our chemical sector.  If a terrorist were to attack that sector, there is the potential for casualties on the scale or in excess of 9/11.  I hope it doesn't happen, but it's just a fact that this is the case.  This needs to be the next big push in critical infrastructure protection.  The executive branch has the authority to regulate this area when it's being transported.  It needs no new statutory authority there, just needs executive action.

*Id.*  "This should be the highest priority," according to Dr. Falkenrath.  "The other ones don't matter nearly as much.  This one does."  *Id.*[8]

---

[8] *See also* Richard A. Falkenrath, *We Could All Breathe Easier,* The Washington Post, March 29, 2005, at A15 (noting that there has been "no meaningful improvement in the security of

C.    **The District of Columbia's Terrorism Prevention Act**

It is against this backdrop that the District of Columbia acted on February 1, 2005, to "prohibit, on an emergency basis, large shipments of certain extremely hazardous materials through or near the United States Capitol in order to reduce the risk of attacks by terrorists ...."[9]  District Act § 1.  The "Terrorism Prevention Act" restricts transportation of certain ultrahazardous materials, specifically the most dangerous toxic-by-inhalation chemicals, within a 2.2 mile radius of the U.S. Capitol (the "Capitol Exclusion Zone").  District Act § 4.  Following months of hearings and public debate on the

---

these chemicals moving through our population centers").

[9] The February 1st Act was passed by the D.C. Council on an "emergency" basis.  Under the District of Columbia Home Rule Act, "emergency" legislation is effective for 90 days and does not require Congressional oversight.  Home Rule Act § 412 (D.C. Code § 1-204.12).  Permanent legislation, by contrast, requires two readings and a 30-day congressional review period.  *See id.* § 602(c) (D.C. Code § 1-233).  On March 1, 2005, the D.C. Council approved a companion bill in "temporary" form (D.C. Bill 16-78), which provides for a 225-day extension of the Emergency Act, and which was transmitted to Congress for approval on March 22, 2005. The "Temporary Act" is substantively identical to the "Emergency Act," and both ordinances will be treated as one and the same for purposes of this suit.  On April 1, 2005, the District of Columbia, through its Department of Transportation, published in the D.C. Register implementing regulations "pursuant to the authority of Section 7 of the Terrorism Prevention in Hazardous Materials Transportation Emergency Act of 2005, effective February 15, 2005 (D.C. Act 16-43), or any substantially identical successor legislation...." 52 D.C. Register 3446-3454 (Apr. 1, 2005).

legislation, the D.C. Council made the following legislative

findings accompanying the Act:

- A terrorist attack on a large-quantity hazardous materials shipment near the United States Capitol ("Capitol") would be expected to cause tens of thousands of deaths and a catastrophic economic impact of $5 billion or more.

- The threat of terrorism facing D.C. residents and workers in the vicinity of the Capitol requires an urgent response that recognizes and addresses the unique status of this area in American political life and history, and the terrorism risk that results from this status.

- The federal government has not acted to prevent the terrorist threat resulting from the transportation of dangerous volumes of ultra-hazardous materials through the Capitol Exclusion Zone.

- Shippers of ultra-hazardous materials do not need to route large quantities of ultra-hazardous chemicals near the Capitol in order to ship such chemicals to their destinations, and alternative routes would substantially decrease the aggregate risk posed by terrorist attacks.

- Requiring permits for ultra-hazardous shipments from a Capitol Exclusion Zone that encompasses all points within 2.2 miles of the Capitol would impose no significant burden on interstate commerce.

District Act § 2.

CSXT operates two main rail lines through the District: a

north-south main line ("I-95 Line") running along the eastern

seaboard from Florida to New England, and an east-west main line

("B&O Line") running from Washington, D.C. west to Chicago and

St. Louis.  *See* P.I. Mem. at 12.  Because both lines pass within

the Exclusion Zone, the Act will effectively require CSXT to

utilize alternative routes for the regulated materials.[10]  *See*
P.I. Mem. at 17.

    **D.   The Challenge**

    Plaintiff claims that the Terrorism Prevention Act is
"protectionist legislation that, on its face, unreasonably
burdens interstate commerce, interferes with the comprehensive
federal regulation of the shipment of hazardous materials by rail
and invites other local jurisdictions to enact copycat
legislation which could, by crazy-quilt coverage, bring to a halt
the interstate shipment of critically important materials
throughout the United States of America."  Amended Compl. ¶ 1.[11]

    CSXT seeks a judicial declaration that the District Act (1)
violates the Commerce Clause of the United States Constitution;
(2) is preempted by the express preemptive provisions of the
Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106, the
federal Hazardous Materials Transportation Act ("HMTA"), 49
U.S.C. § 5125, and the Interstate Commerce Commission Termination
Act ("ICCTA"), 49 U.S.C. § 10501(b); and (3) is an *ultra vires*

---

    [10] The Act provides that the prohibitions may be lifted in
"cases of emergency" or upon a demonstration that there is "no
practical alternative route."  District Act §§ 4, 5(a).

    [11] Plaintiff is joined by *amicus curiae* Norfolk Southern
Railway Company, the Association of American Railroads, and the
National Industrial Transportation League.

act by the D.C. Council contrary to the limited delegation of legislative authority given to the District by Congress under the Home Rule Act.  Amended Compl. ¶ 17.

Plaintiff urges the Court to declare invalid and permanently enjoin the implementation and enforcement of the District Act. In the alternative, plaintiff requests the entry of a preliminary injunction to prevent the law from taking effect, pending the Court's determination of the merits of plaintiff's case.  At stake, according to plaintiff, is no less than the "preservation of an interstate rail system that is essential to our overall national economy, to our public health, to our welfare and to the security of the nation."  *See* CSXT Reply at 8.

The United States also plays a key role in this dispute. The Justice Department filed a "Statement of Interest" and participated in oral argument supporting plaintiff's legal positions and arguing that the District Act is invalid.  In addition, the United States has filed a motion to enforce a declaratory order of the Surface Transportation Board ("STB" or the "Board"), which found that the District Act would "unreasonably interfere with interstate commerce" and is preempted by the ICCTA.  *See CSX Transportation, Inc. – Petition for Declaratory Order* (STB Fin. Docket No. 34662, March 14, 2005) ("STB Order").

13

The District of Columbia is joined by intervenor-defendant Sierra Club in defending the Constitutionality of the Terrorism Prevention Act.

**E.   Standards of Review**

**1.   Summary Judgment**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In considering the motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998).

Summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, a party opposing summary judgment must offer more than mere unsupported allegations or denials and its opposition must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

###     2.    Injunctive Relief

In considering whether to grant an application for emergency injunctive relief, a court must consider four factors:  (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claims, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) whether an injunction would harm the defendants or other interested parties (the balance of harms), and (4) whether the public interest would be furthered by an injunction.  *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  The factors "must be viewed as a continuum, with more of one factor compensating for less of another."  *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C. 2004).  Thus, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *Serono Labs.*, 158 F.3d at 1318.

Finally, because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly.  *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C.

Cir. 2004) ("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion."); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(a preliminary injunction is "an extraordinary and drastic remedy").

## III. DISCUSSION

### A.   Preemption

"[T]he Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.  Thus, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)(citing *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).

Plaintiff argues that the District Act conflicts with and must "give way" to three federal statutes: the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106, the federal Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5125, and the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10501(b).  Each of these statutes recognizes that a uniform national program is preferable to a patchwork of state and local regulations, but they do not entirely eliminate the states' role in the national framework.  Instead, each statute

16

includes an express preemption clause that precisely circumscribes the borders of federal and non-federal authority in the statutes' respective subject areas:

(a) **The FRSA.** Under the FRSA, states may regulate in the area of railroad safety and security "until" the federal government "prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106. In addition, if addressing "essentially local" hazards, the FRSA authorizes states to take "more stringent" measures as long as they are not "incompatible" with federal regulations, and do not "unreasonably burden interstate commerce."[12] *Id.*

(b) **The HMTA.** The HMTA preempts non-federal regulation if it is (1) "not possible" to comply with that regulation and a federal regulation, or (2) the non-federal regulation presents an "obstacle" to accomplishing and carrying

---

[12] **49 U.S.C. § 20106**
Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.  A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.  A State may adopt or continue in force a more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order (1) is necessary to eliminate or reduce an essentially local safety or security hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce.

out the federal framework.  49 U.S.C. § 5125(a).  The HMTA also

preempts state or local requirements that are not substantively

the same as federal requirements in five specified areas,

including hazmat classification and packaging, the use of

shipping documents, notification of unintentional releases, and

design and manufacturing standards for shipping containers.[13]

---

[13] **49 U.S.C. § 5125**

**(a)** General. --Except as provided in subsections (b), (c), and
(e) of this section and unless authorized by another law of the
United States, a requirement of a State, political subdivision of
a State, or Indian tribe is preempted if--
(1) complying with a requirement of the State, political
subdivision, or tribe and a requirement of this chapter, a
regulation prescribed under this chapter, or a hazardous
materials transportation security regulation or directive issued
by the Secretary of Homeland Security is not possible; or
(2) the requirement of the State, political subdivision, or
tribe, as applied or enforced, is an obstacle to accomplishing
and carrying out this chapter, a regulation prescribed under this
chapter, or a hazardous materials transportation security
regulation or directive issued by the Secretary of Homeland
Security.

**(b)** Substantive differences.--(1) Except as provided in
subsection (c) of this section and unless authorized by another
law of the United States, a law, regulation, order, or other
requirement of a State, political subdivision of a State, or
Indian tribe about any of the following subjects, that is not
substantively the same as a provision of this chapter, a
regulation prescribed under this chapter, or a hazardous
materials transportation security regulation or directive issued
by the Secretary of Homeland Security, is preempted:(A) the
designation, description, and classification of hazardous
material. (B) the packing, repacking, handling, labeling,
marking, and placarding of hazardous material. (C) the
preparation, execution, and use of shipping documents related to
hazardous material and requirements related to the number,
contents, and placement of those documents. (D) the written
notification, recording, and reporting of the unintentional
release in transportation of hazardous material. (E) the design,
manufacturing, fabricating, marking, maintenance, reconditioning,

*See* 49 U.S.C. § 5125(b).

      **(c)  The ICCTA.**  Finally, Congress included in the ICCTA a broadly worded preemption provision providing that the jurisdiction of the STB over transportation by rail carriers, including remedies with respect to rates, practices, routes, services, and facilities of such carriers, is exclusive.[14]  *See* 49 U.S.C. § 10501(b).

      In every preemption case, "the purpose of Congress is the ultimate touchstone."  *Geier v. Am. Honda Motor Co.*, 166 F.3d 1236, 1237 (D.C. Cir. 1999)(quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)).  This purpose can sometimes be inferred from the depth and breadth of the regulatory scheme.  *See, e.g., Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  However, "[i]f the statute contains an express pre-emption

---

repairing, or testing of a packaging or a container represented, marked, certified, or sold as qualified for use in transporting hazardous material.

    [14] **49 U.S.C. § 10501(b)**
The jurisdiction of the Board over--
(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 507 U.S. at 664.  Because the FRSA, HMTA, and ICCTA each contain express preemption clauses, the Court's task is relatively straightforward.[15]

### 1.   FRSA Analysis

As described above, state laws relating to rail safety and security may stand until the federal government "prescribes a regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C. § 20106.  The word "cover" implies something more than mere planning or first steps.  *See Easterwood*, 507 U.S. at 664 ("cover means 'to comprise, include, or embrace in an effective scope of treatment or

---

[15] The parties dispute whether the District Act is entitled to the traditional presumption against preemption for state health and safety regulations.  *See Geier*, 166 F.3d at 1237 ("In areas where States have exercised their historic police powers (such as the health and safety of their citizens), courts must start with a presumption against preemption, absent a 'clear and manifest purpose of Congress.'").  However, in this case no "presumptions" are necessary, either for or against preemption, because the Court need only follow the plain language of relevant preemption clauses to determine Congress' preemptive intent.  *See Tyrrell v. Norfolk Southern Ry. Co.*, 248 F.3d 517, 524 (6th Cir. 2001) ("A debate over whether this type of railroad regulation is a historical function of the federal government or the States is unnecessary as the Supreme Court specifically held that a presumption against federal preemption is embodied in the savings clauses of [the FRSA]")(citing *Easterwood*, 507 U.S. at 665, 668)).

operation'")(quoting Webster's Third New International Dictionary 524 (1961)).  "To prevail on the claim that the regulations have preemptive effect, [plaintiffs] must establish more than that they 'touch upon' or 'relate to' that subject matter." *Id.* Rather, "preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.; see also Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 352 (2000).

The Supreme Court has observed that this language displays "considerable solicitude" for state law. *Easterwood*, 507 U.S. at 665; *see also United Transp. Union v. Foster*, 205 F.3d 851, 860 (5th Cir. 2000)(when deciding whether state rail safety laws are preempted, "we interpret the relevant federal regulations narrowly to ensure that the careful balance that Congress has struck between state and federal regulatory authority is not improperly disrupted in favor of the federal government").  The FRSA also seems to preserve the longstanding and "settled principle that, in the absence of legislation by Congress, the States are not denied the exercise of their power to secure safety in the physical operation of railroad trains within their territory, even though such trains are used in interstate commerce."  *See Atl. Coast Line R.R. v. State of Georgia*, 234 U.S. 280, 291 (1914)(noting that this principle "has been the law since the beginning of railroad transportation").

Following the events of September 11th, Congress amended the
FRSA and the HMTA to expand their coverage to rail *security* as
well as safety.  *See* Homeland Security Act of 2002, Pub. L. 107-
296, §§ 1710-1711, 116 Stat. 2319 (amending 49 U.S.C. § 5103 and
49 U.S.C. § 20103)(Nov. 25, 2002).  These amendments explicitly
preserved the FRSA and HMTA preemption clauses, making clear that
the longstanding principles expressed by the Supreme Court in
*Atlantic Coast Line Railroad* remain viable today.  *See id.*
(amending 49 U.S.C. § 5125 and 49 U.S.C. § 20106).  After a
transformative event like 9/11, the federal government must
rapidly adjust and prioritize its response.  Not every threat can
be addressed at once.  Complete preemption of state safety laws
would leave the country defenseless until the federal government
can discover, study, and respond to each and every risk.  In
contrast, the existing statutory scheme allows states to exercise
their traditional police powers to protect their citizens *until*
the federal government has devised a comprehensive, nationwide
solution.  Even then, if a particular location faces atypical
risks, it can enact local safeguards as long as they are not
incompatible with the federal scheme.  This is cooperative
federalism at its finest.  Indeed, the floor debate on the bill
that eventually became the FRSA (S. 1933) highlighted the
legislation's "meaningful concept of creative federalism."  91
Cong. Rec. 34578 (1970)(statement of Sen. Prouty).  As another

congressman noted, the legislation is a "creative compromise" which "furthers the Federal-State partnership" and "recognizes the important role which States can play in a national framework." *Id.* at 27613 (Rep. Pickle).

Therefore, in order for the District Act to survive, there must either be some gap in the federal framework for the District to fill, *see Tyrrell*, 248 F.3d at 525 (finding Ohio's track clearance regulation a "permissible gap filler in the federal rail safety scheme"), or the Act must respond to "essentially local" hazards without conflicting with the federal response or unreasonably burdening commerce. *See Burlington Northern and Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 795 (7th Cir. 1999) ("Under this scheme, then, state regulations can fill gaps where the Secretary has not yet regulated, and it can respond to safety concerns of a local rather than national character.").

This inquiry requires a clear distinction between federal regulations covering the inherent "operational" risks of running trains or moving hazmats, and actions focused on the deliberate targeting and destruction of hazmat rail cars by terrorists. *See United Transp. Union*, 205 F.3d at 860 ("When applying FRSA preemption, the Court eschews broad categories such as 'railroad safety,' focusing instead on the specific subject matter contained in the federal regulation."). This conceptual distinction is critical because existing transportation safety

23

regulations designed to protect against spills or other accidents were not designed to address the risk of terrorism.[16]

The federal government has recognized that "DOT's hazardous materials transportation safety program has historically focused on reducing risks related to the unintentional release of hazardous materials," and that new regulations focusing on *security* may be needed. *See* 68 Fed. Reg. 34472 (June 9, 2003); 69 Fed. Reg. 50988, (Aug. 16, 2004). DHS and DOT are examining and seeking comments on the "feasibility of initiating specific security enhancements" such as "obscuring the visibility of TIH [toxic-inhalation hazard] cargoes, temporary storage of TIH materials in rail tank cars, tank car integrity, and tracking and communications." *See* 69 Fed. Reg. at 50989. A former high-level DHS official has also publicly called on DHS and DOT to "promulgate regulations that will, over time, require chemical shippers to track the movement of all hazardous chemicals electronically; to report this data to DHS in real time; to use fingerprint-based access controls for all chemical conveyances; to adopt container signs that do not reveal the contents to most observers; to perform rigorous background checks on all employees; to strengthen the physical resilience of chemical containers; to reduce chemical loads; to ship decoy containers

---

[16] For example, a typical railroad tank car is not currently designed to withstand an intentional attack with missiles or explosives. *See* 49 C.F.R. Part 179.

alongside filled containers; and to install perimeter security at loading and switching stations." *See* Richard A. Falkenrath, (formerly Deputy Homeland Security Advisor and Deputy Assistant to the President (2003-2004)), *We Could All Breathe Easier,* The Washington Post, March 29, 2005, at A15.  These measures, according to Falkenrath, should be linked to harsh civil and criminal penalties for violators.  *Id.*

Although it continues to review these options, the federal government has not yet come to an authoritative regulatory decision regarding possible security enhancements for rail shipments of toxic-inhalation materials.  Plaintiff, however, alleges that the federal government and CSXT are engaging in a number of other activities to promote the secure rail transportation of hazmats through the District of Columbia.  *See, e.g.,* CSXT Reply in Support of Mot. to Enforce at 19-20. Briefly, plaintiff submits that:

- Following September 11, 2001, the rail industry began independently assessing and voluntarily upgrading the security of the national rail network.  In the spring of 2004, after consultation with the government, CSXT began voluntarily rerouting loaded cars of the regulated materials on the I-95 (north-south) line. *See* P.I. Mem. at 6, 43.

- On March 25, 2003, DOT published Final Rule HM-232, which requires persons who offer for transportation or transport certain highly hazardous materials, including rail carriers, to develop and implement voluntary security plans and to train appropriate employees in security measures. *See* 68 Fed. Reg. at 14516.  The regulation requires carriers, at a minimum, to address

25

personnel security, unauthorized access, and en route security. *See id.* CSXT has developed its own plan pursuant to this regulation, which has been reviewed by representatives of TSA and FRA. *See* P.I. Mem. Ex. 9, Testimony of Skip Elliott, CSXT Assistant Vice President Public Safety (Nov. 22, 2004).

- TSA, with the cooperation of CSXT, recently undertook a "comprehensive vulnerability assessment" of approximately 42 miles of rail lines within the Capital Beltway. *See* P.I. Mem. Ex. 8, Testimony of Thomas Lockwood, Director of the Department of Homeland Security's Office of National Capital Region Coordination (Nov. 22, 2004)(describing the "D.C. Rail Corridor Project"). This study was followed by development of a Buffer Zone Protection Plan and a Freight Rail Hazard Analysis. *See* CSXT Ex. 47, Elliott Decl. ¶¶ 12-15. TSA and CSXT are now in the process of implementing the enhanced security measures recommended by TSA. *Id.*

- CSXT continues to consult on a regular basis with the federal government, especially in connection with major events and following specific intelligence of security threats. *See* CSXT Ex. 47, Elliott Decl. ¶¶ 17-18. CSXT will make operational changes, including rerouting if appropriate, at the specific request of the government. *Id.*

Nevertheless, because this is a facial challenge, plaintiff and the United States have elected not to rely on these measures, and have instead asked the Court to focus solely on their "purely legal" arguments and the public record. *See* CSXT Reply at 7 ("The Court need not delve into any contested factual issues in order to declare the District Act invalid and to issue a permanent injunction prohibiting implementation and enforcement of a null and void local law."); *see also* 3/23/05 Tr. at 59-61. As a "courtesy to the Court," however, the United States provided an *in camera, ex parte* presentation by two federal government

26

rail security experts on the afternoon of April 4, 2005.  *See*
U.S. Notice and Proffer of Additional *In Camera, Ex Parte*
Testimony.  The experts provided a general overview of the
federal government's rail security approach and described some
planned security enhancements currently under study, in
development, and being implemented in and near the District of
Columbia.  Due to the non-specific nature of the testimony, and
the fact that at this stage it remains untested, uncorroborated,
and unsubstantiated, the information is of limited evidentiary
significance to the Court's legal analysis at this juncture.  In
any event, plaintiff and the United States "continue[] to
maintain that this factual information is unnecessary to the
Court's decision of the legal questions presently before it."
*Id.* at 2-3; *see also* U.S. Opp. to Mot. to Strike ("The United
States' position was, and is, that the *in camera, ex parte*
testimony is not relevant to the Court's decision on its
preemption and Commerce Clause arguments.").[17]

Plaintiff and the United States argue that HM-232--the
regulation requiring rail carriers to prepare security plans--is

---

[17] **SEALED FOOTNOTE.** [This footnote contains Sensitive
Security Information, as defined by 49 C.F.R. Part 15 and 49
C.F.R. Part 1520, and the contents are sealed from the public and
counsel of record for the parties, with the exception of the
United States.  Counsel of record for the United States may
receive a copy from the Court's chambers.  The United States, of
course, may release the contents of this footnote at its
discretion.]

a regulation that, on its face, preempts the District Act.  *See*
U.S. Statement at 11-12 (arguing that the March 25, 2003
regulations, "clearly cover, and indeed substantially subsume,
the subject matter of secure transportation of hazardous
materials, including routing").  The Court disagrees.  The plain
language of this rule indicates that the government intended
industry-authored security plans to be a "first step" rather than
a comprehensive response.  *See* 68 Fed. Reg. at 14511 (informing
carriers that Security Plans are the "first step in what may be a
series of rulemakings to address the security of hazardous
materials shipments" and noting that TSA is "developing
regulations that are likely to impose additional requirements");
*see also* 68 Fed. Reg. at 14520 (noting the government's estimate
that a large company will only "require about 50 hours to develop
a security plan that meets the requirements of this final rule").
The government could not have intended this level of effort--
roughly one busy week of work for one railroad employee--to
comprehensively "cover" the crucial matter of rail hazmat
security.  Furthermore, there is no evidence in the record that
the government has ever rejected or even conditioned the
substantive elements in a carrier's plan, nor is it clear whether
there are any penalties or sanctions for noncompliance.  Finally,
although CSXT's security plan was alluded to on multiple
occasions at the March 23, 2005 hearing and the April 4, 2005 *in*

28

*camera* presentation, the plan has never been submitted to the Court for its review nor is it clear from the record what the document entails.  In fact, at the March 23rd hearing no one in the courtroom--not even the attorneys for the government or CSXT --had ever seen the plan.  *See* 3/23/05 Tr. at 58-59.  The Court is left only with the federal government's representations that CSXT's plan provides for "unhindered access to its rail routes running through the District of Columbia," *see* U.S. Statement at 14, and CSXT's representations that it will not reroute trains unless specifically ordered to by the government.[18]  On this bare record, the Court cannot determine that HM-232 preempts the District Act as a matter of law.

## 2.  HMTA Analysis

The federal government also argues that the District Act conflicts with the government's "deliberate and express decision to allow the entities it regulates to determine the specifics of hazardous materials security plans," and is therefore preempted by the HMTA.  *See* U.S. Statement at 13-14.  The viability of HM-232, according to the government, depends on the "flexibility" it provides companies in "tailoring their security plans to their

---

[18] *See* 3/23/05 Tr. at 30-31. (THE COURT: "I just want a clear answer ... Unless the federal government tells you to reroute all these rail cars or unless some federal judge tells you to do it, you're not going to do it? ..."  MR. NATHAN: "Yes, that is our answer.").

individual circumstances." *Id.* In *National Tank Truck Carriers v. City of New York*, the Second Circuit evaluated New York City ordinances that prohibited the transportation of hazardous gases by tank truck within the City. *See* 677 F.2d 270 (2d Cir. 1982). The Court found that the regulations were "entirely consistent with, and in furtherance of, the federal regulations and their underlying purposes, *i.e.*, to protect against risks to life and property from the transportation of hazardous materials." *Id.* at 274-75. Therefore, the Court held, the regulations "do not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ... as they plainly promote safety, which is the goal of the HMTA, while they do not overlap with any specific directives of the Secretary." *Id.* at 275.

Similarly, here, it is clearly not *impossible* for CSXT to comply with federal rail safety and hazardous materials regulations (including HM-232) and the District Act. Moreover, the District's temporary ban on the passage of ultrahazardous materials seems to further the underlying safety and security purposes of the federal regulations. *Cf. Nat'l Tank Truck Carriers*, 677 F.2d at 275. The Court is not second guessing the government's policy decision to afford carriers the flexibility to choose appropriate security measures. *See* 68 Fed. Reg. at 14515 (setting forth "general requirements for a security plan's components rather than a prescriptive list of specific items").

This is an entirely sensible way to enhance security while imposing minimal burdens on commerce.  Nor is the Court criticizing CSXT's efforts to meet its obligations under the rule.  The Court simply finds that the District Act does not conflict with the federal policy.  Instead, the challenged law is simply a gap-filling measure that is intended to minimize the risk of terror attack while the federal government contemplates authoritative action.[19]

### 3.  ICCTA Analysis

Plaintiff argues that the ICCTA precludes "all state efforts to regulate rail transportation," notwithstanding the well-established cooperative framework in the area of rail safety and security under the FRSA and HMTA, and "even where the statute in question could be characterized as an exercise of state and local police powers to protect health, safety, and the environment." *See* P.I. Mem. at 36-37 (citing *City of Auburn v. United States*, 154 F.3d 1025 (9th Cir. 1998); *Wis. Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000)).

The flaw in plaintiff's argument is that it interprets the

_____

[19] Final Rule HM-232 indicates an intent to preempt state hazardous materials transportation security requirements if compliance with both state and federal requirements is "not possible" or if the state requirement is an "obstacle" to accomplishing the purposes of the federal rule.  *See* HM-232, 68 Fed. Reg. at 14519.  This language mirrors the HMTA's express preemption clause and adds nothing new to the preemption analysis.

ICCTA in a "contextual vacuum," completely ignoring the existence

of the surrounding statutory framework, including the FRSA. *Cf.*

*Medtronic,* 518 U.S. at 484-86 (holding that an express preemption

provision must be interpreted "through the reviewing court's

reasoned understanding of the way in which Congress intended the

statute and its surrounding regulatory scheme to affect business,

consumers, and the law"); *City of Auburn*, 154 F.3d at 1031

(interpreting "the plain language of the ICCTA *and the statutory*

*framework surrounding it*")(emphasis added).[20]  This Court cannot

blindly apply the ICCTA preemption clause without also

considering the purpose, structure, and application of the well-

established federal-state rail safety framework under the FRSA

and HMTA.  *See Iowa, Chicago & Eastern R.R. Corp. v. Washington*

*County, Iowa*, 384 F.3d 557, 561 (8th Cir. 2004)(finding that

"Congress for many decades has forged a federal-state regulatory

partnership to deal with problems of rail and highway safety,"

---

[20] In *City of Auburn*, the Ninth Circuit held that the ICCTA
preempted a county ordinance requiring local environmental review
and approval of railroad construction projects.  *See City of*
*Auburn*, 154 F.3d at 1029-31.  The Court rejected the city's
argument that the ICCTA only preempts *economic* regulation,
finding that there is no clear line between "economic" and
"environmental" regulation.  *See id.* at 1031 ("if local
authorities have the ability to impose 'environmental' permitting
requirements on the railroad, such power will in fact amount to
'economic regulation' if the carrier is prevented from
constructing, acquiring, operating, abandoning, or discontinuing
a line").  However, one can only presume that if there existed a
federal law preserving an explicit sphere of state authority for
railroad *environmental* laws, as the FRSA does in the area of rail
safety, the *City of Auburn* case may have come out differently.

and the "ICCTA did not address these problems"); *Tyrrell*, 248 F.3d at 523 (when a state regulation "has a connection with rail safety," the FRSA, not the ICCTA, "provides the applicable standard for assessing federal preemption"); *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 n.18 (5th Cir. 2001)(finding that a Texas anti-blocking statute was preempted by the ICCTA, but acknowledging that a state *safety* regulation might have led to "a substantially different result" under the FRSA).  In short, "the ICCTA and its legislative history contain no evidence that Congress intended for the STB to supplant FRA's authority over rail safety."  *Tyrrell*, 248 F.3d at 523; *see also Boston & Maine Corp. v. STB*, 364 F.3d 318, 321 (D.C. Cir. 2004)("primary jurisdiction over railroad safety belongs to the FRA, not the STB").

The District Act is clearly aimed at rail safety; it requires no changes to the infrastructure of the interstate railroad system, nor does it directly regulate the physical routing of trains. (CSXT trains may continue traveling through the District as long as they do not carry the banned hazmats.) Plaintiff's expansive interpretation of ICCTA preemption in this case would undermine the longstanding partnership between states and the federal government in the areas of rail safety and security, and would ignore Congress' intent as expressed through the FRSA, the HMTA, and the Homeland Security Act.  *See Tyrrell*,

248 F.3d at 523 (finding that Congress "inten[ded] for the ICCTA and FRSA to be construed *in pari materia*"); *Iowa, Chicago & Eastern R.R.*, 384 F.3d at 559 (plaintiff's argument that the ICCTA preempts state rail safety law "ignores relevant federal statutes that were enacted before ICCTA, that are administered by one or more agencies other than the ICC or the STB, and that Congress left intact in enacting the ICCTA").  Accordingly, the Court finds that the ICCTA does not independently preempt the District Act.

### 4.  The District's Status under the FRSA

Finally, plaintiff argues that even if the District Act would otherwise be a valid state law, the District of Columbia cannot take advantage of the FRSA's cooperative framework because "the plain language of Section 20106 refers only to 'states' and FRSA does not include the District of Columbia in its definition of 'state' as some federal statutes do."  P.I. Mem. at 27.  This argument implies that Congress intended to exclude District of Columbia residents from safeguards enjoyed by everyone else in this Nation.  The Court will not ascribe such an intent to Congress.  The District of Columbia is treated as a State and equal partner in this country in many fundamental situations. *See, e.g., District of Columbia v. John R. Thompson, Inc.,* 346 U.S. 100 n.9 (1953) (citing delegations of power to regulate commerce); *Milton S. Kronheim & Co., Inc., v. District of*

34

*Columbia*, 91 F.3d 193, 199-200 (D.C. Cir. 1996); *cert. denied*, 520 U.S. 1186 (1997)(treating District as a state for Commerce Clause purposes); *Huffman v. District of Columbia*, 39 A.2d 558, 560 (D.C. 1944)(describing the District's "police power" to provide for public health and welfare).  Furthermore, the District is specifically designated as a State in the HMTA and in dozens of instances solely in Title 49 (Transportation) in the Code of Federal Regulations.  *See* D.C. Opp. at 36 n.27 (citing regulations).

Plaintiff offers no explanation why Congress would have chosen to treat the District as a "state" under the HMTA, but not the FRSA.  Moreover, plaintiff's construction would create a vacuum of authority in the District of Columbia--while everyone else in the country enjoys two tiers of authority over rail safety, District of Columbia residents would be left without protections until the federal government acts.  A more plausible explanation for the FRSA's silence on D.C.'s status is simply that the FRSA was enacted in 1970, three years prior to the date the District was delegated the power of self-government.  *See* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774 (1973)("Home Rule Act").  The HMTA was enacted one year later, in 1974.[21]

_____

[21] Congress passed an omnibus bill in 1970 which enacted, among other provisions, the FRSA.  *See* Pub. L. 91-548, 84 Stat. 971.  Congress enacted the HMTA in 1974 as part of a second

Thus, Congress simply did not contemplate a need to designate
D.C. as a "state" at the time the FRSA was passed.

As the Supreme Court has instructed, Congress' preemptive
intent

> primarily is discerned from the language of the
> pre-emption statute and the statutory framework
> surrounding it.  Also relevant, however, is the
> structure and purpose of the statute as a whole as
> revealed not only in the text, but through the
> reviewing court's reasoned understanding of the way in
> which Congress intended the statute and its surrounding
> regulatory scheme to affect business, consumers, and
> the law.

*Medtronic*, 518 U.S. at 486 (internal quotes and citations
omitted); *see also Stafford v. Briggs*, 444 U.S. 527, 535
(1980)("'it is well settled that, in interpreting a statute, the
court will not look merely to a particular clause in which
general words will be used, but will take in connection with it
the whole statute ... and the objects and policy of the
law'")(quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194
(1857)).  Given the objects and policy of the FRSA, it is this
Court's reasoned understanding that Congress did not intend to
single out District of Columbia residents for less protection
than that enjoyed by the rest of the country.

**B.   Motions to Enforce the STB Order**

The preemption issue has another twist.  On Monday, March
14, 2005, following a petition from CSXT, the Surface

---

omnibus bill.  *See* Pub. L. 93-633, 88 Stat. 2156.

Transportation Board ("STB" or the "Board")[22] issued a
declaratory order expressing the Board's view that the District
Act "unreasonably burdens interstate commerce" and "is preempted"
by section 10501(b) of the ICCTA.  *CSX Transportation, Inc. –
Petition for Declaratory Order* (STB Fin. Docket No. 34662, March
14, 2005)("STB Order").[23]  Although the Board noted that it "does
not have the power to invalidate the D.C. Act," it nonetheless
exercised its discretion to issue the order, noting that the
decision "might assist the court."  *See* STB Order at 5-6.
However, plaintiff and the United States argue that the STB Order
conclusively binds the judgment of this Court and requires the
Court to mechanically apply the Board's reasoning to "enforce"
its decision against the District of Columbia.  *See* CSXT Mot. to
Enforce at 8 (arguing that it is "indisputable that this Court

---

[22] The ICCTA replaced the former Interstate Commerce
Commission with the STB, a quasi-independent three-member body
within the Department of Transportation.  *See* 49 U.S.C. §§ 701-
703; 49 U.S.C. § 10501(b).  Among the Board's responsibilities
are oversight of the construction, acquisition, operation, and
abandonment of rail lines (49 U.S.C. §§ 10901-10907); railroad
rates and services (49 U.S.C. §§ 10701-10747, 11101-11124); and
rail carrier consolidations, mergers, and common control
arrangements (49 U.S.C. §§ 11323-11327).

[23] DOT filed comments supporting CSXT's petition, as did
twenty-five industry parties representing shippers and the
railroads.  The District of Columbia and the Sierra Club filed
comments opposing CSXT's petition.  *See* P.I. Mem. Ex. 13 (Docket,
CSX Transportation, Inc. Petition for Declaratory Order, STB
Finance Docket No. 34662 (Feb. 18, 2005)). The District of
Columbia's petition for reconsideration is currently pending
before the Board.

has no discretion in this matter, and may not undertake to examine the validity or correctness of the STB Order.  The Court is simply required to enforce it").

The evolution of this argument is tortured to say the least. In the initial pleadings supporting plaintiff's motions, CSXT argued that the STB's ruling was not binding, but was entitled to "deference" by the Court.  *See* CSXT Reply at 12.  Two days before the March 23, 2005 hearing, however, in the last two pages of a reply brief, the United States argued for the first time that the Court lacked authority to question the STB Order and is bound to apply its reasoning to preempt the District Act.  *See* U.S. Reply at 17-18.  This argument prompted a second round of briefing which focused on the impact, on this Court, of the STB Order. CSXT adopted this position at the March 23 hearing and, a day later, amended its complaint to add a count to "enforce" the STB Order.  The Amended Complaint named the United States as a statutory defendant in an attempt to satisfy the jurisdictional requirements of 29 U.S.C. § 2322.  On March 30th, the United States sought to realign itself as a party plaintiff and brought its own motion to enforce the STB Order.

Defendants maintain that these motions are doomed by fatal procedural irregularities.  *See* Sierra Opp. to Mot. to Enforce at 2 ("[N]either CSXT nor the United States provides support for the proposition that a private party without authority to enforce an

STB order can name the United States as a sham defendant--in an improperly filed amended complaint--and that the United States can then simply realign itself and act as if it had brought the suit itself."). The Court has serious reservations about the procedural irregularities identified by defendants. This case has proceeded on an extremely expedited schedule, and the burdens of responding to an entirely new argument, raised in a reply brief and only days before implementation of the District's law, has taxed the parties as well as the Court. Nevertheless, the Court will, in the interests of justice and fair consideration of the issues, accept CSXT's and the government's respective "motions to enforce" as properly filed and presented.

Plaintiff and the United States submit that this Court has no jurisdiction to second-guess the merits of the STB Order because 28 U.S.C. § 2342 (the "Hobbs Act") and 28 U.S.C. § 2321 bifurcate proceedings to *review* and proceedings to *enforce* STB orders between the courts of appeals and the district courts, respectively.[24] "A refusal to enforce the STB's Order," argues plaintiff, "would be tantamount to suspending, enjoining, setting

---

[24] **28 U.S.C. 2321(a)** Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title. **(b)** The procedure in the district courts in actions to enforce, in whole or in part, any order of the Surface Transportation Board other than for payment of money or the collection of fines, penalties, and forfeitures, shall be as provided in this chapter.

aside or invalidating the STB Order" and would violate the statutes providing that any such action may only be taken by the United States Court of Appeals.  CSXT Proposed Facts at 2; *see also* U.S. Reply at 17 (arguing that this Court lacks jurisdiction to decide any claim "that amounts to a collateral attack on the STB decision or that otherwise might affect an appellate court's future jurisdiction over the STB decision").

The Court disagrees.  By its own admission, the STB lacks jurisdiction over legislation enacted by the District of Columbia.  *See* STB Order at 5 ("the Board does not have the power to invalidate the D.C. Act").  Subtitle IV of Title 49 of the U.S. Code vests the Board with jurisdiction over transportation by "rail carriers," but it does not empower the Board to regulate municipal governments.  *See* 49 U.S.C. §§ 10101 *et seq.* Accordingly, there is simply nothing in this case for the Court to "enforce."

Plaintiff argues that the Board has broad jurisdiction under the Administrative Procedure Act to issue declaratory orders to "terminate a controversy or remove uncertainty."  *See* 5 U.S.C. § 554(e).  However, the District of Columbia's legislative response to the threat of terrorism is not the type of "controversy" that Congress entrusted the STB to "terminate."  While this Court may recognize the Board's expertise in matters related to the economic regulation of railroads, Congress could not have

intended to grant the three members of the Board veto power over the District of Columbia's--or any state or local government's-- legislative judgments regarding the safety and security of its citizens.[25]

Plaintiff's argument hinges on whether the STB Order is reviewable in the Court of Appeals.  However, in order to meet the Hobbs Act's requirements for review, final agency actions must "either determine rights or obligations, or have some legal consequence."  *See Intercity Transp. Co. v. United States*, 737 F.2d 103, 106 (D.C. Cir. 1984).[26]  The STB Order does not, in and of itself, produce any legal consequences.  Therefore, the Court of Appeals would arguably have no jurisdiction in an action to "enjoin or suspend" the Order pursuant to 28 U.S.C. § 2321.  *See City of Miami v. Interstate Commerce Comm'n* 669 F.2d 219 (5th Cir. Unit B 1981).

---

[25] STB's website describes the Board as "an economic regulatory agency that Congress charged with the fundamental missions of resolving railroad rate and service disputes and reviewing proposed railroad mergers." *See Overview of the STB* (http://www.stb.dot.gov/stb/about/overview.html).

[26] In *Intercity Transp. Co.*, the D.C. Circuit held that "[o]nly final Commission actions are reviewable" under the Hobbs Act.  *See* 737 F.2d at 106.  "Two criteria generally guide finality determinations.  First, the action must represent a 'terminal, complete resolution of the case before the agency'... Second, the action must either determine rights or obligations, or have some legal consequence."  *Id.* (citing *Am. Dairy of Evansville, Inc. v. Bergland*, 627 F.2d 1252, 1260 (D.C. Cir. 1980)).

In *City of Miami*, the City petitioned the Fifth Circuit for review of an ICC order declaring an ocean terminal facility owned by the Florida East Coast Railway (FEC) to be a "line of railroad" within the meaning of the former Interstate Commerce Act. *See* 669 F.2d at 220. The ICC issued the declaratory order at the behest of the railroad, which was trying to resist the city's condemnation of the ocean terminal for use as a public park. The Court, however, held that the ICC Order was merely an "advisory ruling" of the Commission's interpretation of the law and not a "final order" subject to appellate review:

> The ICC order in the present case does not determine any 'rights or obligations,' nor do any 'legal consequences ... flow from the (ICC's) action.' The order neither permits nor prohibits abandonment of the FEC terminal. Moreover, the Commission's decision does not purport to enjoin either the FEC or the City from taking any action with respect to the subject property, nor does it have any legal effect on either party's position ... Though styled a 'declaratory order,' the Commission's action is nothing more than an advisory ruling that FEC's ocean terminal is a 'line of railroad.'

*Id.* at 221-22.

Similarly, here, the STB Order does not purport to enjoin the District of Columbia from taking any action and is nothing more than an advisory ruling of the Board's view that the District Act is preempted. *See* STB Order at 2 ("*In the Board's view*, section 10501(b) preempts the D.C. Act.")(emphasis added). Accordingly, this Court is not persuaded that the STB Order is a "final agency action" that could be challenged in the Court of

Appeals, nor is it the proper subject of an enforcement action in this Court pursuant to 28 U.S.C. § 2321(b).  Therefore, plaintiff's argument that this Court's decision would somehow interfere with the Court of Appeals' jurisdiction misses the mark.

Furthermore, even if this were a properly constituted enforcement action, this Court would not be deprived of its authority, under Article III of the Constitution, to exercise its equitable authority to independently interpret the law.  To decide otherwise would raise serious separation of powers concerns, as it would effectively turn an Article III court into a mere rubber-stamp for an executive branch agency's interpretation of the Constitution.  *See Marbury v. Madison*, 5 U.S. 137 (1803)("It is emphatically the province and the duty of the judicial department to say what the law is.").

The STB's sweeping legal conclusion seems to ignore the FRSA and HMTA's explicit preservation of some non-federal authority over rail safety and security and post-ICCTA cases that have held the same.  *Compare* STB Order at 7 (finding that the ICCTA "does not leave room for state and local regulation of activities related to rail transportation"), *with Norfolk Southern Ry.*, 529 U.S. at 352 (finding that preemption of a state rail safety standard "will lie only if the federal regulations substantially subsume the subject matter of the relevant state law"); *see also*

43

*Tyrrell*, 248 F.3d at 522-23 (finding that an expansive interpretation of ICCTA's preemptive scope would "implicitly repeal" the FRSA's express savings clause); *accord Iowa, Chicago & Eastern R.R.*, 384 F.3d at 561.  This could hardly be Congress' intent.  *See Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 133-34 (1974)(observing the familiar canon of construction that "repeals by implication are disfavored").

The Board also seems to engraft a "reasonableness" inquiry (which does not appear in the text of the ICCTA) into the STB Order's analysis of state legislative actions under section 10501(b).  *See* STB Order at 9 (states may maintain some traditional regulation "so long as no unreasonable burden is imposed on a railroad"); *id.* at 10 (states cannot take actions that would "unreasonably burden interstate commerce").  It is unclear how the Board reached its conclusion that the District Act "would unreasonably interfere with interstate commerce," *see id.* at 11, especially given the fact that the Order was entirely devoid of any factual findings.  *See id.* at 6 (expressly acknowledging that "we do not make any factual findings").  In fact, the Board apparently declined the District's request for an opportunity to conduct discovery, as authorized by 49 C.F.R. § 1114.21(a), on the District Act's purported impact on interstate commerce.  *See* D.C. Opp. to Mot. to Enforce at 8-9.

Finally, the STB Order appears to be directly at odds with

positions the Board has taken in other cases.  *See Illinois, Chicago & Eastern R.R.*, 384 F.3d at 560 (describing the position "urged by" the STB as amici that "the FRSA, not ICCTA, determines whether a state law relating to rail safety is preempted"); *Tyrrell*, 248 F.3d at 521 (noting that appellant's concern about the district court's broad interpretation of ICCTA preemption is "shared by the United States and the STB"); *see also* Sierra Opp. to Mot. to Enforce at 15 (citing previous STB decisions).  The Board's apparent departure in this case from prior interpretations of ICCTA's preemptive scope is in tension with the familiar principle that "reasoned decisionmaking requires an agency to explain changes of policy from past decisions." *Continental Air Lines, Inc. v. CAB*, 551 F.2d 1293, 1303 (D.C. Cir. 1977); *see also Baltimore & Annapolis R.R. v. Washington Metro. Area Transit Comm'n*, 642 F.2d 1365, 1370 (D.C. Cir. 1980).

Plaintiff's theory that this Court must stamp the STB Order with its judicial *imprimatur*, no matter how clearly erroneous the Board's legal analysis, offends the very essence of the Court as an instrument of justice.  In upholding a district court's refusal to "enforce" an administrative order it deemed improper, the Tenth Circuit wisely observed that

> [i]t is true the inferior Federal courts are creatures
> of statute but, nevertheless, historically, they are
> possessed with the inherent equitable powers of common
> law courts.  If they are ever stripped of judicial
> discretion in equitable proceedings they will be

45

relegated to the standing of mere administrative
enforcement agencies.

*United States v. Brown*, 331 F.2d 362, 365 (10th Cir. 1964); *see
also* Louis L. Jaffe, *The Judicial Enforcement of Administrative
Orders*, 76 Harv. L. Rev. 865, 869 (1963)("A court should rarely
be required--nor should it be thought that there is any intention
to require it--to participate actively in the enforcement of a
judgment which it finds offensive.").  By enacting the Hobbs Act,
Congress did not intend to strip the district courts of their
inherent equitable authority, nor did Congress intend to allow
plaintiffs to avoid judicial determination of constitutional
claims simply by petitioning an administrative agency for a
"declaratory order."[27]

_____

[27] The cases cited by CSXT and the United States involve very
different factual circumstances and do not support plaintiff's
argument.  Unlike *Port of Boston Marine Terminal Ass'n v.
Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970), *FCC v. ITT
World Communications, Inc.*, 466 U.S. 463 (1984), and *Vonage
Holdings Corp. v. Minnesota Pub. Util. Comm'n*, 394 F.3d 568 (8th
Cir. 2004), this case does not involve a party attempting to
evade the required statutory review procedures by collaterally
attacking a final agency order in an improper forum.  Instead,
CSXT --the party *benefitted* by the STB Order--has engaged the
jursdiction of this Court.  *United States v. Ruzicka*, 329 U.S.
287 (1946), and *Telecommunications Research & Action Center v.
FCC*, 750 F.2d 70 (D.C. Cir. 1984)("TRAC"), are similarly
distinguishable.  *Ruzicka* involved a fact-dependent analysis of a
specialized administrative framework regulating the handling and
pricing of milk.  Even though the Court found it would be
"disruptive" to allow milk pricing orders to be open for
independent adjudication in a suit for enforcement, the Court was
"not called upon to decide what powers inhere in a court of
equity, exercising due judicial discretion, even in a suit ...
for enforcement of an order."  *See Ruzicka*, 329 U.S. at 295.  In
*TRAC*, plaintiffs sought a writ of mandamus to compel an FCC

46

**C.   Dormant Commerce Clause**

Although phrased as a positive grant of power to Congress, the Supreme Court has long interpreted in the Commerce Clause a "negative aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994); *see H.P. Hood & Sons*, *Inc. v. Du Mond*, 336 U.S. 525, 537 (1949)(Jackson, J.)("The principle that our economic unit is the Nation ... has as its corollary that the states are not separable economic units.").

Plaintiff argues that the District Act violates this so-called "dormant" aspect of the Commerce Clause "by erecting a protectionist wall around itself" and "isolat[ing] itself in the stream of interstate commerce from a problem shared by all." *See* P.I. Mem. at 21-22 (citing *City of Philadelphia v. New Jersey,* 437 U.S. 617, 629 (1978)).  According to plaintiff, a judicial endorsement of the District Act could engender scores of copycat

---

decision on the legality of certain telephone overcharges.  The Court held that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review in the Court of Appeals."  *See TRAC*, 750 F.2d at 75.  The Court is not persuaded that *TRAC* is relevant where, as here, a plaintiff is seeking to enforce an agency order in a district court pursuant to 28 U.S.C. § 2321.  In any event, *TRAC* clearly has no application where the agency's order is not the kind of "final action" that is the proper subject for appellate review.

bans in other jurisdictions, eventually causing rail traffic of essential hazardous materials to "grind to a halt." *See* P.I. Mem. at 3-4.

Although there is no uniform dormant Commerce Clause "test," the Supreme Court has generally applied a form of strict scrutiny to overtly protectionist state laws, and a more lenient balancing test to facially neutral laws that only "incidentally" burden interstate commerce. *Compare City of Philadephia*, 437 U.S. at 624 ("where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected")*, with Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)(finding that evenhanded regulation "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits").

However, the cases "have eschewed formalism for a sensitive case-by-case analysis of purposes and effects." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). In all cases, the court's essential duty is to root out economic protectionism by "determin[ing] whether the statute under attack ... will in its practical operation work discrimination against interstate commerce." *Best & Co. v. Maxwell*, 311 U.S. 454, 455-56 (1940); *see also City of Philadelphia*, 437 U.S. at 624 (the "crucial inquiry" is whether the challenged law "is basically a protectionist measure, or whether it can fairly be viewed as a

law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental").  Thus, the touchstone for purposes of the Commerce Clause is not whether the state law imposes burdens on interstate commerce *per se*, but whether it burdens commerce *for the state's own economic advantage*.  *See H.P. Hood & Sons,* 336 U.S. at 533 ("This distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law.").

There is a long history of dormant Commerce Clause cases involving state efforts to limit the inflow of solid or hazardous wastes.  For example,

- In *City of Philadelphia,* the Court struck down a New Jersey law that banned imports of out-of-state waste while keeping the state's landfills open to in-state waste generators.  *See* 437 U.S. at 619.

- In *Chem. Waste Mgmt., Inc. v. Hunt*, the Court struck down Alabama's hazardous waste disposal fee that applied only to wastes generated outside the state.  *See* 504 U.S. 334, 336-37 (1992).

49

•       In *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, the Court struck down a Michigan law prohibiting private landfill operators from accepting solid waste originating outside the county in which their facilities operate.  *See* 504 U.S. 353, 355 (1992).

These decisions were influenced by the Court's understanding that "the evil of protectionism can reside in legislative means as well as legislative ends." *City of Philadelphia*, 437 U.S. at 626.  Thus, New Jersey's ban on out-of-state waste was invalid even though the state claimed its ultimate aim was to protect the state's environment.  *Id.*  However, a close examination of the "waste" cases makes clear that the principle of "non-discrimination" is paramount, not blind judicial annulment of all state laws that regulate, or impose burdens on, interstate commerce.  In each case, the invalid state law targeted only interstate sources of waste, while allowing in-state sources to remain unregulated.  As noted by Justice Stevens in his discussion of the *City of Philadelphia* case:

> New Jersey has every right to protect its residents' pocketbooks as well as their environment.  And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected.  But 'whatever New Jersey's ultimate purpose, it may not be accompanied by discriminating against articles of commerce coming from outside that State unless there is some reason, apart

from their origin, to treat them differently.'

*Fort Gratiot*, 504 U.S. at 360 (quoting *City of Philadelphia*, 437
U.S. at 626-27).

The importance of this non-discrimination principle is
further highlighted by the Court's comparison, in *City of
Philadelphia,* of New Jersey's ban on out-of-state waste with
traditional state quarantine laws, which have consistently been
upheld even though "directed against out-of-state commerce."  *See*
437 U.S. at 628.  The distinction, according to the Court, is
that quarantine laws, "did not discriminate against interstate
commerce as such, but simply prevented traffic in noxious
articles, whatever their origin."  *Id.* at 629.  New Jersey, on
the other hand, made no claim that the regulated waste was
"inherently harmful" or that its "very movement" endangered
health.  Rather, the state law created an artificial distinction
between out-of-state and domestic waste in an obvious effort to
"impose[] on out-of-state commercial interests the full burden of
conserving the State's remaining landfill space."  *See id.* at
628-629.

Plaintiff argues that the depression-era case of *Edwards v.
California*, 314 U.S. 160 (1941) is "most analogous" to the
instant case.  *See* CSXT Reply at 32.  In *Edwards,* the Supreme
Court struck down a California law that prohibited the "bringing
into the State any indigent person who is not a resident of the

51

State."  *See* 314 U.S. at 166.  Although the Court acknowledged
the "staggering" problems of "health, morals, and especially
finance" caused by the huge influx of migrants into California,
it held that the statute "must fail under any known test of the
validity of State interference with interstate commerce."  *Id.* at
167.  The Court did not articulate the precise grounds for
invalidating the statute, but it was clearly influenced by
Justice Cardozo's famous observation that the Constitution was
"'framed upon the theory that the peoples of the several states
must sink or swim together, and that in the long run prosperity
and salvation are in union and not division.'"  *Id.* at 167
(quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523
(1935)).  In any event, California's ill-fated attempt to close
its borders to the poor was clearly motivated, at least in part,
by economic protectionism.  The law "discriminated" between
people based solely on their state of origin.  The resident poor
were allowed to remain and share in the state's bounty while
outsiders were permanently excluded.  *See City of Philadelphia*,
437 U.S. at 627 (characterizing *Edwards* as an attempt to
"preserve the State's *financial* resources by fencing out indigent
immigrants")(emphasis added); *accord Chem. Waste Mgmt.*, 504 U.S.
at 341.

In this case, unlike all of the other dormant Commerce
Clause cases cited by plaintiff and known to this Court, there is

no discernable economic rationale for the District Act.  Unlike
New Jersey's protectionist ban on out-of-state waste, the
District Act treats *all* classified hazardous waste the same,
recognizing that the "very movement" of such waste endangers
health, not its state of origin.  *Cf. City of Philadelphia*, 437
U.S. at 629; *Chem. Waste Mgmt.,* 504 U.S. at 343.  Furthermore, no
in-state industry is benefitted at the expense of out-of-state
interests nor are there efforts to "suppress or mitigate the
consequences of competition between the states." *Cf. Baldwin,*
294 U.S. at 522; *West Lynn Creamery*, 512 U.S. at 205.  Nor has
any party, at any stage of this litigation, articulated any
possible motivation on the part of the D.C. Council other than a
sincere concern about the effects of a terrorist attack on the
citizens of and visitors to the District of Columbia.  While the
Terrorism Prevention Act may impose some incidental burdens on
interstate commerce, it creates no artificial distinctions or
suspect classifications--in short, it does not "discriminate"
against commerce.  *See Nat'l Tank Truck Carriers*, 677 F.2d at 273
(finding that New York's hazardous gas routing requirements
"plainly do not have economic protectionism as their objective"
because they are "directed at a legitimate local concern for
public safety" and they "apply even-handedly both to intrastate
and interstate commerce").  Thus, the District Act bears none of
the hallmarks of protectionism that have traditionally raised

Commerce Clause concerns.

The Supreme Court has not hesitated to strike down ostensible state "health & safety" laws masking protectionist motives.  *See Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 686 (1981)(striking down Iowa's ban on trucks longer than 60 feet because the asserted safety benefits were "illusory"); *accord Buck v. Kuykendall*, 267 U.S. 307, 315 (1925)(striking down a Washington State act because, in the words of Justice Brandeis, "[i]ts primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition").  However, if the state is truly motivated by health and safety concerns, the Court "will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce."  *Kassel*, 450 U.S. at 670 (quoting *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 449 (1978)(Blackmun, J., concurring)).  The D.C. Circuit has followed this approach.  Where a state statute is nondiscriminatory and advances legitimate safety concerns, the Court of Appeals has held that the dormant Commerce Clause inquiry is at an end.  *See Electrolert Corp. v. Barry*, 737 F.2d 110, 113 (D.C. Cir. 1984).[28]

_____

[28] In *Electrolert*, the Court found that the District's ban on radar detectors was "nonprotectionist in nature and is based on nonillusory safety benefits."  737 F.2d at 113.  Therefore, the Court was able to uphold the Act without performing any "fine balancing test" nor inquiring closely into the government's factual assumptions.  *Id.*

Because the District Act does not "discriminate" against interstate commerce, nor does any party claim its safety benefits are "illusory," it comes before the Court in the "strongest possible posture." *See Electrolert*, 737 F.2d at 113.  It is one thing to use the dormant Commerce Clause to root out "protectionist" motives in the guise of state health and safety regulations.  It is quite another for a court to use the dormant Commerce Clause to sit in judgment of a legislative body's balancing of benefits and burdens when that elected body acts in good faith to protect its citizens.  The Court will decline the invitation to second-guess the legislative judgment of the D.C. Council by deciding that the District Act "unreasonably" burdens commerce.

### D.   District of Columbia Home Rule Act

The Constitution vests in Congress the authority to "exercise exclusive Legislation in all Cases whatsoever, over ... the Seat of the Government of the United States."  U.S. Const., Art. I, § 8, cl. 17.  In 1973, however, Congress enacted the Home Rule Act, granting the District government limited legislative powers, while retaining its ultimate authority over the District of Columbia.  *See* Home Rule Act (D.C. Code § 1-201.02).

Plaintiff argues that the Terrorism Prevention Act is invalid because it violates one of the explicit limitations Congress placed on the Council's legislative authority, that is:

"[t]he Council shall have no authority to ... [e]nact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively to the District."  Home Rule Act § 602(a)(3)(D.C. Code § 1-206.02). Plaintiff thus contends that because the District Act impacts the flow of interstate commerce and is not a "purely local" matter restricted to the District's boundaries, the Act exceeds this limitation.  *See* P.I. Mem. at 38.

The cases cited by Plaintiff do not support this argument. While the courts in *District of Columbia v. Greater Washington Cent. Labor Council*, 442 A.2d 110 (D.C. 1982), and *Techworld Dev. Corp. v. D.C. Pres. League*, 648 F. Supp. 106 (D.D.C. 1986), discuss in general terms the Congressional intent in passing the Home Rule Act to delegate authority to the D.C. government over local, as opposed to national, matters, both courts read the limitations on the D.C. Council's authority more narrowly than Plaintiff suggests.  *See Techworld*, 648 F. Supp. at 114-15 ("'The functions reserved to the federal level would be those related to federal operations in the District, and to property held and used by the federal government for conduct of its administrative, judicial, and legislative operations; and for the monuments pertaining to the nation's past.'")(quoting *Greater Washington Cent. Labor Council*, 442 A.2d at 116 (quoting legislative

history)).

In the *Greater Washington* case, the District of Columbia Court of Appeals concluded that the D.C. Council had not exceeded its authority when it passed the District of Columbia Workers' Compensation Act despite the fact that Congress had passed – prior to enacting the Home Rule Act – a compensation law extending federal workers' compensation protections to private sector employees in the District of Columbia. *See* 442 A.2d at 113. Similarly, in *Techworld,* this Court concluded that the D.C. Council did not violate its authority under the Home Rule Act when it closed a street and transferred title to a developer, despite the fact that title to one of the streets had been held by the United States government. *See* 648 F. Supp. at 113.

In *McConnell v. United States*, on the other hand, the D.C. Court of Appeals did conclude that the D.C. Council violated the limitations in the Home Rule Act when it enacted legislation that directly conflicted with and effectively repealed a federal law. 537 A.2d 211, 213-14 (D.C. 1988). In *McConnell*, the D.C. legislature passed the Uniform Controlled Substances Act ("UCSA") with mandatory-minimum prison terms for certain offenses. *Id.* As a result of UCSA, the trial court determined that Mr. McConnell, a second-time offender, was not eligible at sentencing for treatment as an addict, although that option was historically available to sentencing judges under the federal Narcotic Addicts

Rehabilitation Act ("NARA").  *Id.* at 213.  Because of this direct conflict, the court concluded that the District's law was invalid.  *Id.* at 214.  The *McConnell* case, however, is not instructive for present purposes because the Terrorism Prevention Act does not directly conflict with or repeal any federal law. Indeed, if there were a law on point the District's law would be preempted, as discussed above.

Finally, though not cited by the parties, the case of *Am. Council of Life Ins. v. District of Columbia*, 645 F. Supp. 84 (D.D.C. 1986), is on point.  In 1986, the D.C. government enacted the Prohibition of Discrimination in the Provision of Insurance Act, prohibiting insurers from discriminating on the basis of a positive AIDS or AIDS-related screening test or from denying benefits as a result of an individual developing AIDS.  *Id.* at 85.  The American Council of Life Insurance moved for summary judgment and a preliminary injunction, claiming that because the law would regulate insurance activities beyond the District of Columbia, it violated Section 602(a)(3) of the Home Rule Act's limitation prohibiting the D.C. Council from enacting legislation "whose 'application is not restricted exclusively to the District'", the same limitation at issue in the instant case. *Id.* at 88.  Insurers argued that the legislation would lead to large premium increases for policy holders and that the law would "subject out-of-state insurers doing business in the District of

Columbia to penalties if the companies discriminate against individuals exposed to AIDS." *Id.* at 85, 88.

Finding that the legislative history of the District's anti-discrimination in insurance law clearly indicated that the "statute would only apply when the company was doing business in the District of Columbia," this Court upheld the District's law and granted summary judgment for the District. *Id.* at 89. *See also Dimond v. District of Columbia*, 618 F. Supp. 519 (D.D.C. 1984), *rev'd on other grounds,* 792 F.2d 179 (D.C. Cir. 1986)(upholding a District of Columbia law that required auto-insurance companies doing business in the District to provide out-of-state liability coverage against a challenge that the law violated the Home Rule Act's prohibition on District legislation that would apply beyond the District).

These cases demonstrate that there is a distinction, for Home Rule Act purposes, between the incidental effects of local regulation and direct regulation of external conduct. Like the laws at issue in *Am. Council* and *Dimond*, the Terrorism Prevention Act is clearly intended only to apply within the boundaries of the District of Columbia. The law does not run afoul of the Home Rule Act's requirement that the application of D.C. laws be restricted to the District simply because it may have financial implications for plaintiff beyond the District.

**IV. ANALYSIS**

59

**A.    Summary Judgment**

Plaintiff argues that this is a very simple case.  Only the federal government--not the District of Columbia or any other state or local government--has the authority to regulate the transport of hazardous materials by rail in interstate commerce.  *See* P.I. Mem. at 2.  The Terrorism Prevention Act, argues plaintiff, is facially invalid because it usurps this exclusive federal role.  Because CSXT contends that this case presents a "purely legal question," it has not presented nor relied upon evidence of specific measures taken by the federal government to address the threat of terrorism.  Indeed, plaintiff argues that the District Act would be invalid even if the federal government were doing nothing to address the threat.[29]

However, the foregoing discussion and analysis demonstrates that this case is hardly simple.  The relevant statutory framework does not simply eliminate all state jurisdiction over rail safety and security, but rather preserves a limited sphere of state authority, in partnership with the federal government.  When viewed in this light, it becomes clear that this case is fraught with genuine issues of material fact.  The key legal

---

[29] *See* 3/23/05 Tr. at 60-61 (THE COURT: "If the federal government said, we're not doing anything and we'll get around to it whenever we can, the city council, in the legitimate exercise of its police power, would not have the authority to protect its citizens?"  MR. NATHAN: "That is correct.").

issues include, for example, whether or not the federal government has "substantially subsumed" the subject of rail terrorism or whether the District Act is an "obstacle" to federal objectives.  *See supra* Part III(A).  However, plaintiff has failed to introduce evidence at this point to enable the Court to make these determinations as a matter of law.  In other words, the record is devoid of the factual predicate that would support the ruling of law sought by plaintiff.  Accordingly, the Court must **DENY** plaintiff's Motion for Summary Judgment.

## B.   Preliminary Injunction

The Court next considers plaintiff's request for preliminary injunctive relief.  This requires an analysis of four traditional equitable factors.  *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

### 1.   Likelihood of Success

Plaintiff's legal arguments are not trivial.  The relevant federal statutes express a preference for uniform federal regulation in the areas of rail safety and hazardous materials transportation.  *See* 49 U.S.C. § 20106; 49 U.S.C. § 5125.  They also provide the federal government with ultimate authority to choose the most appropriate policies to enhance railroad security.  *See* 49 U.S.C. § 114.  Because the federal government has ultimate authority, the District Act may be preempted even in

61

the unlikely event that the federal government decides not to take affirmative measures to enhance the security of trains in the District. *See Arkansas Elec. Coop. Corp. v. Arkansas Public Comm'n*, 461 U.S. 375, 384 (1983)("a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision to regulate"). However, before the Court can reach that conclusion, or any other decision on the merits, it needs to consider competent evidence that the federal government has thoroughly studied the issue and come to a definitive and authoritative regulatory *decision*.

Plaintiff is requesting the extraordinary relief of a preliminary injunction. Thus, the burden is on plaintiff to demonstrate that the balance of equities are in its favor. *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). However, as previously stated, plaintiff has elected not to produce evidence of the disputed material facts critical to the legal issues in this case. In short, it is impossible to determine whether the federal government has done enough to "substantially subsume" the subject because plaintiff has failed to provide the Court with the detailed factual predicate to support such a showing. Without more information, the Court cannot say at this time that plaintiff is likely to succeed on the merits of its

claims.

The Court takes very seriously the sensitive nature of the government's measures to disrupt terrorist activities. The effectiveness of many of these measures depends on their continued secrecy. However, there are means available, including protective orders and other appropriate measures, for plaintiff to attempt to meet its burden of proof and to share sensitive information with appropriate representatives of the other parties without compromising national security interests. Much of the critical information in this case is Sensitive Security Information ("SSI"), as defined by 49 C.F.R. Part 15 and 49 C.F.R. Part 1520. *See also* 49 U.S.C. § 40119(b) and 49 U.S.C. § 114(s). SSI is not "classified" *per se*, but rather is protected at the discretion of the Assistant Secretary for TSA and the Secretary of Transportation if, in their judgement, disclosure would be "detrimental to the security of transportation." *See* 49 C.F.R. §§ 15.5(a)(3) & 1520.5(a)(3). The regulations restrict disclosure of SSI to those persons with a "need to know" the information. *See* 49 C.F.R. §§ 1520.7, 1520.11. CSXT has been granted access to SSI so that it may work with the government to "implement critical security measures." *See* U.S. Reply at 11 n.14. In addition, the United States has acknowledged that "[a]s a partner in the federal government's efforts to protect the District of Columbia rail corridor from terrorist attacks, the

63

District of Columbia also has a 'need to know' certain SSI."
U.S. Resp. to Mot. to Compel at 2.  Therefore, when discovery
moves forward in this case, "the United States will assist the
parties in that discovery to ensure that SSI is protected in a
manner that is as minimally disruptive to the litigation as
possible."  U.S. Reply at 11 n.14.  At this juncture, the United
States has informed the Court that it is CSXT's burden to submit
information to the United States in order for the government to
determine whether it may be shared with the District.  *See* U.S.
Resp. to Mot. to Compel at 2.  "Once it does, both TSA and DOT
will review the submitted information in detail, will identify
SSI therein, and will determine what, if any, of that information
may be shared with the District Defendants and/or Defendant-
Intervenor Sierra Club."  *Id.*  Before this critical next step,
the Court will not blindly interfere with the actions of the
District of Columbia to safeguard its citizens from a
catastrophe.

### 2.  Irreparable Harm

CSXT claims that it will be required to reroute thousands of
rail cars over substantially longer routes if the District Act is
allowed to take effect.  Plaintiff argues that this rerouting
would impose operational and financial burdens on the railroad
and increased delay and uncertainty in the supply chain.  *See*
P.I. Mem. at 5-6.  There are significant factual disputes as to

64

the number of railcars the District Act would affect and the
resulting burden on CSXT.  According to the Amended Complaint,
the law could affect 11,400 of CSXT's cars per year, out of
approximately 7,000,000 total carloads of freight and about
500,000 carloads of hazardous materials.  *See* Am. Compl. ¶¶ 12,
80.  This represents 0.16% of CSXT's total national rail traffic
and 2.3% of its total national hazmat traffic.  Based on this
projection, CSXT estimates an additional $2 to $3 million in
direct costs per year if the District Act were to take effect on
a permanent basis.  *See* CSXT Proposed Facts ¶ 6; P.I. Mem. Ex. 1,
Gibson Dep. at 21-24.  Defendants, on the other hand, estimate
that the Act will require the rerouting of just 2,313 cars
annually, which represents just 0.03% of CSXT's annual traffic.
*See* Sierra Proposed Facts ¶ 6; D.C. Proposed Facts ¶ 5 (basing
calculations on CSXT's verified interrogatory responses).

At this preliminary stage of the proceedings, it is
impossible to resolve this factual dispute.  Regardless of which
estimates are more accurate, however, these injuries appear to be
chiefly economic and administrative in nature, and do not
represent the magnitude of "irreparable harm" that would justify
an emergency injunction in this case.  *See Wisconsin Gas Co. v.*
*FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)(finding that recoverable
economic loss constitutes "irreparable harm" only where the loss
threatens the very existence of the movant's business); *see also*

*Sampson v. Murray*, 415 U.S. 61, 90 (1974)("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.")

CSXT acknowledges that these financial and logistical burdens are not of primary significance.  The "primary harm," according to plaintiff, is the District Act's "unlawful interference with the comprehensive system of federal regulation and oversight" and the "disruptive effect" of potential copycat bans in other communities.  *See* CSXT Proposed Facts ¶¶ 1-2.  The Court understands CSXT's concerns, but these assertions are more properly addressed under the "public interest" prong of this Circuit's balancing test.  In sum, the evidence demonstrates that the direct effects of the District Act will not result in burdens on CSXT that would rise to the level of "irreparable harm."

### 3.  Balance of Harms

Balanced against CSXT's asserted harms is the uncontested and basically unquantifiable risk of a major terrorist attack resulting in mass casualties.  A July 2004 study by the Homeland Security Council estimated that an attack on a chlorine gas facility in an urban area could result in 17,500 deaths, 10,000 severe injuries, and 100,000 hospitalizations.  *See* Sierra Opp. Ex. 10, Planning Scenarios: Executive Summaries Created for Use in National, Federal, State and Local Homeland Security

Preparedness Initiatives, The Homeland Security Council, July 2004, Scenario 8.  A recent United States Naval Research Institute study found that an attack on a chlorine railcar, during a political event or celebration on the National Mall, could kill or seriously injure up to 100,000 people in the first half an hour.  *See* Sierra Opp. Ex. 9, Report by Dr. Jay Boris, United States Naval Research Institute (Jan. 23, 2004).

In *National Tank Truck Carriers*, plaintiff shipping companies argued that New York City's rerouting regulations might increase shipping costs, delay deliveries, and burden commerce. *See* 677 F.2d at 273.  The Second Circuit accepted plaintiffs' representations, but found that "these inconveniences are not unconstitutionally disproportionate when balanced against the public interest in avoiding a catastrophic accident in a densely populated urban area."  *Id.* at 274.  This Court agrees.  CSXT argues that it has been "more than three years after the attacks of September 11, 2001," and there is no reason to believe there is an imminent emergency.  *See* P.I. Mem. at 6.  The Court sincerely hopes plaintiff is right, but it is unwilling to take that gamble.  It would be irresponsible, at best, for the Court to enjoin the District Act, potentially placing tens of thousands of lives at risk, before plaintiff has satisfied its burden of at least producing competent evidence demonstrating its entitlement to relief on the merits.

### 4.  Public Interest

The District of Columbia argues that the public interest in this case overwhelmingly mandates denial of the motion, even if CSXT were able to show a prospect of success on the merits or irreparable injury.  D.C. Opp. at 42.  The District's argument, however, is countered by the United States' prediction that "[t]he D.C. Act would negatively affect the United States' interests in national security, public safety, public health, and a strong economy."  U.S. Statement at 8.  The Court appreciates and has not taken lightly the United States' position and its special role in this case and in setting policy to protect the Nation.  However, the government's assessment appears to be based on some faulty assumptions.

First, the government claims that "the D.C. Act would have the effect of increasing the aggregate risk associated with the transportation of hazardous materials" and would "shift that increased risk to other parts of the country."  *See* U.S. Statement at 9.  However, this reasoning conflates the risk of rail accidents with the risk of terrorism.  The government's prediction of increased aggregate risk flows from its conclusion that "[t]he risks associated with the transportation of hazardous materials correspond to the amount of time in transit."  *See id.* at 8.  Despite this bald assertion (supported only by a citation to a 1998 FRA Track Safety study that clearly did not contemplate

68

the risks of rail terrorism), the government does not address defendants' persuasive arguments that any assessment of the risk of terrorism must take into account both the *probability* of an attack and its likely *consequences*.  *See* Sierra P.I. Opp. Ex 6 ¶ 16 (Millar Decl.).  In the specific circumstances of this case, these factors are significantly influenced by the characteristics of the route, such as the population density of the neighborhoods abutting the rail lines and the attractiveness of the "target" for terrorists.  *See* Sierra Opp. Ex. 3 ¶ 14 (Glickman Decl.).  This means that the fight against terrorism is not a "zero-sum game."  By routing trains out of high-risk areas and through lower risk areas, the government would not be simply "shifting the risk," but would actually be reducing the aggregate risk faced by the population as a whole.  *See* D.C. Opp. Ex. 2 ¶ 15 (Shuman Decl.)(the risk of terrorist attack "moves only with the location ... and not with the hazmat"); Sierra Opp. Ex. 5 ¶ 16 (Koopman Decl.)(rerouting to pass through locations lacking high-value terrorist targets "would almost certainly decrease the aggregate social risk"); Sierra Opp. Ex. 6 ¶ 39 (Millar Decl.) (rerouting around high threat areas "substantially reduces the aggregate risk").

Although the District of Columbia is not alone in confronting the threat of terrorism, it cannot seriously be contested that the District faces disproportionate risks.

"Because of its status as home to all three branches of the Federal government, as well as numerous Federal buildings, foreign embassies, multinational institutions, and national monuments of iconic significance, the Washington, D.C., Metropolitan Area continues to be an obvious high priority target for terrorists."  Maryland Three Airports: Enhanced Security Procedures for Operations at Certain Airports in the Washington, D.C., Metropolitan Area Flight Restricted Zone, 70 Fed. Reg. 7150, 7152-53 (Feb. 10, 2005).  Washington, D.C. was already targeted once on September 11, 2001, and residents and visitors to the District--including motorists delayed by new security checkpoints on Capitol Hill or airline passengers required to remain in their seats within 30 minutes of Reagan National Airport--are constantly reminded of the continuing threat and the need for special security precautions in Washington, D.C.

To be sure, the "operational" risks of moving hazmats by railcar, as opposed to the risk of terrorist attack, do move with the railcar rather than the location of the rails.  Therefore, there may be some added incremental risks absorbed by communities along rerouted lines.  However, plaintiff has not made this crucial distinction and has provided no evidence suggesting that, in the aggregate, these additional operational risks will outweigh the reduction in the risk of terrorist attack. Defendants, however, have noted statistics from the Association

of American Railroads that "99.9968% of Carloads are accident free," and CSXT's representations that out of half a million shipments of hazardous materials by CSXT in 2003, there were only seven accidental releases--resulting in no injuries. *See* Sierra Proposed Facts ¶ 21 (citing CSXT discovery documents).  Given these statistics, and without additional evidence, plaintiff's argument that the Terrorism Prevention Act will increase aggregate risks is without a solid foundation in fact. *See* Sierra Opp. Ex. 3 ¶ 18 (Glickman Decl.)(finding CSXT's prediction that rerouting trains around the District would increase aggregate risk is "not substantiated by the process of risk assessment").

Further, plaintiffs argue that an injunction will caution other jurisdictions against passing copycat bans that could impede the flow of essential goods to the public and "prove disastrous to our national transportation system."  P.I. Mem. at 7.  CSXT is not the first railroad company to make this kind of argument.  In 1914, the Atlantic Coast Line Railroad implored the Supreme Court to find Georgia's new law requiring electric headlights an "unwarrantable interference with interstate commerce."  "If Georgia may prescribe an electric headlight," lamented the railroad, "other states through which the road runs may require headlights of a different sort ... which would delay and inconvenience interstate traffic." *See Atl. Coast Line R.R.*,

71

234 U.S. at 292.  The Supreme Court, however, declined to
invalidate the state safety regulation, holding that

> [i]f there is a conflict in such local regulations, by
> which interstate commerce may be inconvenienced,--if
> there appears to be need of [rules] which will govern
> the entire interstate road, irrespective of state
> boundaries,--there is a simple remedy; and it cannot be
> assumed that it will not be readily applied if there be
> real occasion for it.  That remedy does not rest in a
> denial to the state, in the absence of conflicting
> Federal action, of its power to protect life and
> property within its borders, but it does lie in the
> exercise of the paramount authority of Congress, in its
> control of interstate commerce, to establish such
> regulations as, in its judgment, may be deemed
> appropriate and sufficient.  Congress, when it pleases,
> may give the rule and make the standard to be observed
> on the interstate highway.

*Id.*

Here, also, there is a "simple remedy."  If, and when, the
Court is presented with competent evidence demonstrating
plaintiff's entitlement to federal preemption, a basis will exist
to vacate the District Act.  In other words, even if defendants
are ultimately successful on the merits, the District Act will
stand only so long as there is a gap in federal coverage.
Furthermore, the District of Columbia is somewhat unique because
of its status as a "state" for the purposes of preemption
analysis.  A favorable decision for the District of Columbia here
would not necessarily support copycat *municipal* ordinances.  *See*
*CSX Transp. v. City of Plymouth*, 86 F.3d 626, 628 (6th Cir.
1996)(finding that the FRSA's preemption clause exceptions do not
apply to municipal ordinances).  This understanding of the

72

District's unique status and the temporary nature of the District Act undermines plaintiff's dire predictions of a gridlocked national rail transportation system.

In view of the significant disputed facts critical to the Court's resolution of the legal issues in this case, and because the balance of equities favors the safety and security of the residents of and visitors to the District of Columbia, the Court will **DENY** plaintiff's motions while the Court considers the merits of plaintiff's challenge on an expedited basis.

## V.   CONCLUSION

September 11, 2001 forced this nation to quickly adapt to new risks and new priorities, all competing for immediate attention.  To the extent that a common theme can be discerned from the voluminous submissions in this case, it is that all parties believe that it is in everyone's best interests to have one consistent and comprehensive federal policy addressing the risks of terrorism on our interstate rail system.  This Court agrees.

Until the federal government has formulated a comprehensive response, however, the law preserves a limited role for states to act to protect public safety and security.  This multilayered approach upholds this Nation's federalist tradition and recognizes that our safety and security in this new age will require a team effort and close coordination between the federal

73

government, state governments, and the private sector.[30]
Unfortunately, instead of working together, the parties in this
case are mired in litigation.  It is unfortunate that the time,
energy, and expense that could have been spent making this city
safer will instead be expended in litigation.[31]

Nevertheless, having been presented with this interesting,
novel and complex case, this Court will decide it.  The Court
will keep the big picture in mind--no party disputes the fact
that a terrorist attack on a train carrying hazardous materials
is a real threat that could cost tens of thousands of lives and
billions of dollars in costs and damages.  *See* CSXT Reply at 2
("We do not minimize the potential risks of terrorist acts
against railroad cars carrying hazardous materials.").  The Court
must also be mindful of the January 2005 sworn congressional
testimony of Richard Falkenrath, the former Deputy Homeland

_____

[30] *The National Strategy for the Physical Protection of
Critical Infrastructure and Key Assets*, signed by President Bush
in February 2003 ("National Strategy"), makes clear that the
federal government cannot shoulder the entire burden alone.  It
provides that protection of our critical infrastructure is a
"shared responsibility," and "[t]he 50 states, 4 territories and
87,000 local jurisdictions that comprise this Nation have an
important and unique role to play." National Strategy at 19; *see*
CSXT Rep. to Enforce at 21.

[31] The Court, recognizing that "all the parties in this case
are essentially on the same team," proposed a temporary cooling
off period to enable the parties to make a serious effort at
resolving this litigation with the assistance of the Court.  *See*
4/5/05 Tr. at 6-9.  However, the proposal did not persuade either
CSXT or the United States to even discuss any framework for a
possible settlement.  *See* 4/7/05 Tr. at 9.

Security Advisor to the President, that the federal government has "essentially done nothing" in the area.  *See supra* Part II(A); Sierra Opp. Ex. 24.  CSXT's legal arguments are not without force, and, should plaintiff produce competent evidence of the federal government's response, the Court may ultimately find that the District Act is preempted.  However, against the acknowledged risks that are present in this case, CSXT offers at this time only vague predictions of increased costs and logistical burdens.  *See supra* Part IV(B)(2).  These burdens pale in comparison to the potential devastation predicted to occur in the event of a terrorist attack on a railcar transporting hazmats in the Nation's Capital.  Given these competing interests, the balance of equities clearly favors the District of Columbia and its residents.  This Court will not grant the extraordinary judicial remedy of a preliminary injunction without the benefit of competent evidence to inform the Court's legal analysis, especially when an injunction could expose the District of Columbia, its citizens, and visitors to an unknown and potentially catastrophic risk.

### ORDER

Accordingly, it is by the Court hereby

**ORDERED** that plaintiff's Motion for Summary Judgment is **DENIED WITHOUT PREJUDICE** to reconsideration upon the completion of discovery; and it is

**FURTHER ORDERED** that plaintiff's Motion for Preliminary Injunction is **DENIED;** and it is

**FURTHER ORDERED** that plaintiff's Supplemental Motion for Enforcement of the March 14, 2005 STB Order is **DENIED;** and it is

**FURTHER ORDERED** that the United States' Motion for Enforcement of the March 14, 2005 STB Order is **DENIED;** and it is

**FURTHER ORDERED,** in anticipation of the filing of any Motion to Stay Enforcement of the Court's Order, that the Motions are **DENIED;** and it is

**FURTHER ORDERED** that the parties shall file joint recommendations for further proceedings in this case, or, if unable to agree on joint recommendations, their individual recommendations, by no later than **April 22, 2005 at 12:00 noon;** and it is

**FURTHER ORDERED** that a status conference to discuss further proceedings in this case is scheduled for **April 25, 2005 at 10:00 a.m.** in Courtroom One.

**IT IS SO ORDERED.**


Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **April 18, 2005**